Rockingham
No. 2004-615

THE STATE OF NEW HAMPSHIRE

v.

ELEANOR T. EMERY

Argued: September 14, 2005
Opinion Issued: November 30, 2005

*Kelly A. Ayotte*, attorney general (*Robert S. Carey*, assistant attorney general, on the brief and orally), for the State.

*Paul J. Garrity*, of Londonderry, by brief and orally, for the defendant.

DUGGAN, J. The defendant, Eleanor T. Emery, appeals her conviction after a jury trial in Superior Court (*T. Nadeau*, J.) on nine counts charging theft by unauthorized taking or transfer, RSA 637:3 (1996), and one count charging theft by deception, RSA 637:4 (1996). We affirm.

The jury could have found the following facts. In early 2001, John Lancaster met and began dating the defendant. Sometime thereafter, the defendant and her daughter moved into Lancaster's home. In June 2001, Lancaster hired the defendant to work as a laborer in his demolition business, Lancaster Construction, which he had owned as a sole proprietorship since 1981. Shortly thereafter, the defendant began working in the office, assisting the bookkeeper with the business's finances. By September 2001, the defendant had assumed responsibility for handling the business's finances.

The business had two bank accounts: one for Lancaster Construction at the Community Bank and Trust; the other for Lancaster Properties at Fleet Bank. The defendant handled the bookkeeping for both accounts. She was given authority to sign checks on the Lancaster Construction account but not on the Lancaster Properties account. Lancaster rarely involved himself in the handling of the finances for either account. The defendant and Lancaster also opened a separate joint checking account at Community Bank and Trust.

On January 22, 2002, Lancaster signed a power of attorney, which had been prepared by his lawyer, that gave the defendant authority to act on his behalf in both personal and business-related matters. The next day, the defendant called John Hancock Life Insurance, identified herself as "Mrs. Lancaster," and, using the power of attorney, arranged for a $55,000 loan against the cash surrender value of Lancaster's life insurance policy. Shortly thereafter, the defendant called John Hancock Life Insurance again and arranged for a second loan of $11,500. When she received the checks, she endorsed them and deposited the $55,000 check in the Lancaster Construction account and the $11,500 check in the joint account. Lancaster did not know of or authorize the loans.

In July 2002, Lancaster Construction was converted from a sole proprietorship to a corporation, with the defendant and Lancaster as the sole shareholders. In preparation for the conversion, an accountant reviewed the company's finances. During that process, the defendant told him that the $55,000 deposit to the Lancaster Construction account was her own money that she had loaned to the business. Once the conversion was completed, the Lancaster Construction account was closed and a new account was opened in the new corporate name, Lancaster Construction

and Demolition. The defendant had authority to sign checks on this account.

In November 2002, the defendant again used the power of attorney, this time to arrange for a $153,300 mortgage from MultiState Title Company on one of Lancaster's homes. After MultiState Title Company informed the defendant that the lender, Investment One, would not accept a power of attorney to close on the mortgage, the defendant told MultiState Title Company that Lancaster would not be able to attend a closing, and offered to arrange for the documents to be notarized locally. The defendant then used the power of attorney to have her sister in Maine notarize the documents. The defendant signed Lancaster's name on the documents, which did not indicate that a power of attorney was used. When the defendant received a check from MultiState Title Company in the amount of $91,789.06, she endorsed it and deposited it into the joint account. Lancaster was not aware of the mortgage or of the deposit into the joint account.

In January 2002, the defendant began including overtime hours not actually worked in the calculation of her weekly pay. Although Lancaster signed all of her paychecks, he usually did not look at the checks that he signed. Lancaster was not aware that the defendant was receiving overtime pay and never authorized the overtime payments.

In April 2003, the defendant told Lancaster that she was going to Virginia to see her sister. However, shortly before the defendant left, Lancaster's secretaries informed him that the defendant was not going to Virginia, but was instead going to Key West with her boyfriend, Greg Wilson, whom the defendant had been seeing behind Lancaster's back. After the defendant left for Key West, Lancaster went to the airport and found in her car several boxes of documents. Among those documents were records for the business, as well as some of Lancaster's personal records, including documents relating to the loan on his life insurance policy and the mortgage on his home. Before the defendant returned from Key West, Lancaster changed the locks on the office doors.

Throughout her entire employment, the defendant paid her personal expenses with the money that she obtained from the loans and the mortgage, as well as from funds in the Lancaster Construction, Lancaster Construction and Demolition, and Lancaster Properties accounts. Specifically, she used these funds to pay her credit card bills, as well as bills for a credit card she had opened in Lancaster's name. She sent money to her sister in Virginia that she had obtained from the Lancaster Construction and Demolition account. She also used Lancaster's business and personal funds to purchase a snowmobile trailer and four snowmobiles, one of which was purchased in Wilson's name, and to make

cash payments to Wilson toward the purchase of a boat. Lancaster was unaware of some of these transactions, and as for those of which he was aware, the defendant told him that she had used her own funds; Lancaster did not authorize the use of his business or personal funds.

On appeal, the defendant argues that: (1) a jury instruction was plain error; (2) insufficient evidence supports her conviction; and (3) the trial court erroneously denied her motion *in limine* to exclude evidence disclosed by the State during the week preceding trial as well as her alternative motion to continue.

## I. Plain Error

The defendant argues that the trial court erroneously instructed the jury that she could be convicted of stealing from her own joint account. The defendant concedes, however, that this issue was not raised before the trial court, and has therefore not been preserved for our review. *State v. Blackmer*, 149 N.H. 47, 48 (2003). Nevertheless, the defendant argues that we should review the trial court's jury instruction under the plain error rule. SUP. CT. R. 16-A.

The plain error rule allows us to consider errors either not brought to the attention of the trial court or not raised in the notice of appeal. *Id.* "[T]he rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." *State v. MacInnes*, 151 N.H. 732, 736-37 (2005). Thus, to fall within the plain error rule: "(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* at 737. We have looked to the United States Supreme Court's standards for the application of the federal plain error rule to inform our application of the State rule. *See id.*

On appeal, the defendant argues that, although neither party raised the issue before the trial court, the trial court should have instructed the jury that the defendant could not be convicted of stealing from her own joint checking account. In support of this assertion, the defendant relies upon the statutory definition of "property of another," which "includes property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property." RSA 637:2, IV (Supp. 2005). The defendant contends that each holder of a joint account is "privileged to infringe" the interest of the other in the account, and thus neither holder may be convicted of the unauthorized taking of the property of the other from the joint account. The State contends that the inclusion of the language

"regardless of the fact that the actor also has an interest in the property" serves to include jointly owned property within the definition of "property of another," citing legislative intent and the lack of contrary precedent in the State.

■ Generally, when the law is not clear at the time of trial, and remains unsettled at the time of appeal, a decision by the trial court cannot be plain error. *See, e.g.*, 28 MOORE'S FEDERAL PRACTICE § 652.04[3], at 652-19 (3d ed. 2002); *United States v. Gilberg*, 75 F.3d 15, 18 (1st Cir. 1996) (court may reverse for plain error only if the error "was or should have been 'obvious' in the sense that the governing law was clearly settled to the contrary"). We have never addressed whether a party to a joint checking account may or may not be convicted of stealing from the other party to the account by making unauthorized withdrawals from it. Thus, we cannot say that the trial court's failure to give an alternative instruction *sua sponte* on theft from joint checking accounts was plain error. *Cf. MacInnes*, 151 N.H. at 737.

■ Furthermore, even if we assume that there was error, and that the error was plain, the burden is on the defendant to prove that the error affected substantial rights. 28 MOORE'S FEDERAL PRACTICE, *supra* § 652.04[4], at 652-21; *see United States v. Olano*, 507 U.S. 725, 734-35 (1993). Generally, to satisfy this burden, the defendant must demonstrate that the error was prejudicial—that it affected the outcome of the proceeding. 28 MOORE'S FEDERAL PRACTICE, *supra*; *Olano*, 507 U.S. at 735. The defendant asserts that almost every transaction for which she stood trial involved the joint account, and thus the whole trial was tainted by the allegedly erroneous jury instruction; as a result, "[n]one of the charges for which [the jury] found Ms. Emery guilty can be relied upon as not being affected." However, she has failed to demonstrate how the jury instruction affected the outcome of the trial. Eight of the ten counts on which the defendant was convicted charged her with spending money that she took out of accounts other than the joint account, and those convictions that were connected to the joint account dealt with the defendant's use of the more than $100,000 that she had deposited into it after obtaining the funds unlawfully. Thus, the defendant has not shown that the purported error affected substantial rights. Therefore, we conclude that this jury instruction does not fall within the plain error rule.

## II. Sufficiency of the Evidence

The defendant argues that there was insufficient evidence that her use of Lancaster's funds was unauthorized. She argues that the funds she received from Lancaster were gifts—"the costs [of] keeping an energetic

young companion," which Lancaster "knew [of] and willingly paid." She contends that Lancaster "accepted and ratified" her spending practices, and only viewed those practices as criminal after the relationship soured. However, the defendant points to no testimony in the record to support her argument. "In an appeal challenging the sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Gordon*, 148 N.H. 710, 721 (2002) (quotation omitted).

The defendant apparently contends that we should infer ratification from the fact that Lancaster entrusted her with full responsibility for the business finances, and from the testimony that she purportedly put her own money into the business and was purportedly responsible for keeping it afloat. First, the fact that Lancaster gave the defendant the authority to handle the business finances, even with great latitude, does not require a reasonable jury to find that he gave the defendant the authority to do anything she chose with the funds. Second, the defendant's claims that she put her own money into the business are irrelevant to whether Lancaster accepted or ratified her spending practices. Our review of the record supports a finding beyond a reasonable doubt that Lancaster did not know about, accept or ratify the spending practices for which the defendant was convicted.

The defendant also argues that, because Lancaster initialed each of her paychecks, the jury could not possibly have believed that he did so without looking at and approving the amount. However, the defendant points to nothing in the record, and we find nothing, that indicates that Lancaster looked at each paycheck before he signed it. Thus the jury was free to find credible the testimony that he did not regularly look at paychecks before signing them.

█ There is ample testimony in the record that Lancaster was unaware of the defendant's spending practices until the relationship between the couple ended, and that he did not authorize the acts for which the defendant was convicted. We hold that the evidence, when considered in a light most favorable to the State, was sufficient to support the jury's finding that the spending practices for which the defendant was convicted were unauthorized, and not ratified by Lancaster.

*III. Discovery Motions*

We now turn to the defendant's arguments that the trial court improperly admitted into evidence several items of discovery, which were not turned over to the defendant until a week, or less, before trial, and that

the trial court improperly denied her motion to continue the trial to allow her time to review them.

During the week preceding the scheduled trial date, defendant's trial counsel received a number of discovery items. On May 10, 2004, one week prior to trial, he received the criminal records of potential witnesses for the State, including Lancaster. He also received a computer disk, which the State asserts is a copy of all files found by the Kingston Police on the defendant's computer when she turned it over to them in April or May of 2003. The defendant claims that the computer contained relevant records for the demolition business when she turned it over to the police, but that the relevant records were neither on the computer when the police returned it to her shortly thereafter, nor on the computer disk furnished by the State. In addition, on May 13, 2004, defendant's trial counsel received an audiotape of a series of conversations between the defendant and representatives of John Hancock Insurance Company, as well as 132 pages of discovery, including witness statements and other documents that trial counsel characterized as containing "very crucial information that I believe is going to be used at trial."

Decisions relating to pretrial discovery matters are generally within the sound discretion of the trial court. *State v. Smalley*, 148 N.H. 66, 69 (2002); *see also State v. Dugas*, 147 N.H. 62, 69 (2001) (exclusion of evidence for failure to comply with Superior Court Rule 98 is within discretion of trial court). Absent an unsustainable exercise of discretion, we will not reverse the trial court's decisions with respect to alleged discovery violations or the admission of evidence. *State v. Gamester*, 149 N.H. 475, 478 (2003). "To show that the trial court's exercise of discretion is unsustainable, the defendant must show that the decision was clearly unreasonable to the prejudice of [her] case." *Id.*

At a hearing held on the morning of trial, May 17, 2004, defendant's trial counsel asserted that the information provided by the State over the prior week was prejudicial and denied his client the right to a fair trial. Neither during the hearing in the trial court, nor in the defendant's brief and oral argument to this court, however, did the defendant explain *how* she was prejudiced by the late disclosure of these items. The late production of Lancaster's criminal record was not prejudicial, as the trial court excluded evidence of his past crimes under New Hampshire Rule of Evidence 609. The late production of the computer disk was not prejudicial, as the State did not seek to introduce its contents at trial, and the computer itself had been returned to the defendant approximately one year earlier. The late production of the John Hancock Insurance Company audiotape was not prejudicial, as a call log containing the same substantive information was admitted into evidence by the State without objection by the defendant,

and the defendant does not point to any information contained in the audiotape that did not also appear in the call log. Finally, the State argues that the 132 pages of witness statements and other documents were provided to defendant's trial counsel as soon as they were obtained by the State. *See* SUPER. CT. R. 98(H) (2004). The defendant neither identifies what exactly was included in the 132 pages of discovery, nor demonstrates how she was prejudiced by the late production. Thus we cannot find that the late production of those materials was prejudicial.

■ Absent any specific examples of prejudice from the defendant, we find that she has failed to show that the trial court's ruling was clearly unreasonable to the prejudice of her case. *See Yoder v. Middleton*, 152 N.H. 363, 369 (2005). Thus, she has failed to demonstrate reversible error. *See id.*

*Affirmed.*

BRODERICK, C.J., and DALIANIS and GALWAY, JJ., concurred.