Hillsborough-southern judicial district
No. 2006-709

### THE STATE OF NEW HAMPSHIRE

v.

### THOMAS LAROSE

Argued: February 13, 2008
Opinion Issued: March 20, 2008

*Kelly A. Ayotte*, attorney general (*Karin M. Eckel*, attorney, on the memorandum of law and orally), for the State.

*Thomas Larose*, by brief, *pro se.*

*Kacavas, Ramsdell & Howard, PLLC*, of Manchester (*John P. Kacavas* orally), for the defendant.

DALIANIS, J. The defendant, Thomas Larose, appeals his conviction after a jury trial in Superior Court (*Lynn*, C.J.) of five counts of selling cocaine to an undercover police officer. *See* RSA 318-B:2 (2004). We affirm.

## I. Background

The jury could have found the following facts. The defendant has had a drug problem since he was young; in approximately 1999, he became addicted to crack cocaine. In 2001, he was convicted in New Hampshire of possession of marijuana. He was also convicted of a drug offense in Massachusetts.

In late winter of 2004, after a relapse, the defendant promised his family that he would "be done with dealing and done with cocaine." In April 2005, however, the defendant felt "the urges" to use cocaine again because he had seen "some former associates" at the hotel where he was residing.

On April 27, 2005, a police informant reported to the police that the defendant was selling cocaine in Nashua. The informant and the defendant had known each other since 2002 or 2003, and had used drugs together. They had a mutual friend to whom the defendant had once sold drugs in the informant's presence.

On April 27, at an undercover police officer's direction and in his presence, the informant called the defendant and asked if he would sell drugs to her. The defendant said that he wanted to think about it and invited the informant to meet him at a local restaurant. During the same telephone conversation, she again asked him if he would sell her drugs, and he said "okay." He testified that as of that date, he "hadn't been partying at all in the several days coming" and had not seen the informant since October 2004 when they used drugs together.

He told the informant to pick him up at the restaurant and drive him to the Red Roof Inn where he would purchase cocaine to sell to her. The defendant testified that he agreed to sell the informant drugs because he had been feeling like using cocaine again. As he explained, "At that point I guess I was already thinking about, you know, doing some." He anticipated being able to keep one of the cocaine packages that he would procure for the informant.

The informant drove to the restaurant, with the undercover officer following her. The defendant came out of the restaurant and got into the

informant's car. As she began driving towards the Red Roof Inn, the defendant told her that, instead, they had to go to the Extended Stay Hotel. When they arrived at the Extended Stay Hotel, the defendant took the informant's money and went into the hotel. When he emerged, he returned to the car and gave her cocaine. He kept one package of cocaine for himself and later snorted it. The informant drove the defendant back to the Red Roof Inn and, later, gave the undercover officer the cocaine she had just purchased.

That evening, the informant, a friend of hers, and the defendant smoked crack cocaine together in the defendant's hotel room. Although the defendant testified that for the next week, he and the informant used drugs together "at least two dozen times," the informant denied this. The informant testified that between April 27 and May 2, she visited the defendant at his room at the Red Roof Inn "[m]aybe twice." In that week, the defendant testified that he sold the informant drugs. The defendant testified that he believed that the police did not authorize the informant to use drugs with him. The undercover officer testified that, after April 27, he did not authorize the informant to buy cocaine from the defendant. The officer further testified that, after May 2, he and the informant had no further contact.

On May 2, the informant called the defendant and gave him the phone number of her friend "Nick," the undercover police officer. She told the defendant that "Nick" was "in need of something" and asked the defendant to "help him out for [her] today." The defendant then called "Nick," who asked the defendant if he would sell him cocaine. The defendant testified that he "ma[d]e the mistake of calling ['Nick']" because he was "completely strung out on drugs and looking for a way to make some money."

The defendant told the officer to meet him at a Nashua restaurant, which he did. The defendant and the officer went to the officer's car, where the officer told the defendant that he wanted to buy $200 worth of cocaine. The defendant said, "no problem." They went to the Red Roof Inn, the officer gave the defendant money and the defendant went into the hotel and returned with four "baggies" of cocaine. The officer then drove the defendant to a bar in downtown Nashua.

On May 12, the officer left a message for the defendant on his cell phone. Five minutes later, the defendant returned the call and the officer told him that he wanted to buy another $200 worth of cocaine. The officer met the defendant and, after driving him to a laundromat, gave him $200. The defendant sat on a nearby bench until a car picked him up. Shortly thereafter, the defendant emerged from the car, got back into the officer's vehicle, and eventually gave the officer cocaine after taking some for himself.

The officer called the defendant again on May 24, and left a message asking the defendant to call him back. Within five minutes, the defendant returned the call and asked the officer if he was "looking for the same thing." The officer said that he was and the defendant said "no problem." As with the prior transactions, the defendant instructed the officer to pick him up at a certain location at which he was waiting, and drive him to another location at which he purchased cocaine, which he then sold to the officer. Before the police arrested the defendant, he and the officer completed two additional cocaine transactions on June 2 and June 7. The defendant was indicted for the five drug sales that he made to the undercover officer; he was not indicted for the April 27 sale to the informant.

On appeal, the defendant argues that the trial court erred by: (1) failing to instruct the jury on entrapment; (2) denying his motions to dismiss; and (3) denying his request for a continuance and initially denying without prejudice his motion for additional discovery about the informant.

## II. Analysis

### A. Jury Instruction on Entrapment

The defendant first argues that he sold cocaine to the undercover officer because of police entrapment. He asserts, therefore, that the trial court erred when it denied his request for a jury instruction on entrapment.

#### 1. General Principles

■■ "A trial court must grant a defendant's requested jury instruction on a specific defense if there is some evidence to support a rational finding in favor of that defense." *State v. Lavoie*, 152 N.H. 542, 547 (2005). "Some evidence" means more than a minutia or a scintilla of evidence. *Id.* "To be more than a scintilla, evidence cannot be vague, conjectural, or the mere suspicion about the existence of a fact, but must be real and of such quality as to induce conviction." *State v. Graham*, 614 N.W.2d 266, 272 (Neb. 2000). A court need not "give weight to allegations which are intrinsically improbable or flatly contradicted by irrefutable evidence." *United States v. Rodriguez*, 858 F.2d 809, 815 (1st Cir. 1988). Moreover, while "conclusory and self-serving statements, standing alone, will not suffice," *United States v. Ortiz*, 804 F.2d 1161, 1165-66 (10th Cir. 1986), "a defendant's account, though self-serving, may have weight if it is interlaced with considerable detail and has some circumstantial corroboration in the record." *United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996) (quotation omitted); *see State v. Haycock*, 146 N.H. 5, 9-11 (2001) (court erred by not giving requested instruction on self-defense even though "defendant testified inconsistently on numerous occasions").

■ Without the necessary quantum of evidence to support the defense, jury instructions are not grounds for reversal if read as a whole they fairly cover the issues of law in the case. *State v. Letourneau*, 133 N.H. 565, 568 (1990). We review the trial court's failure to give an instruction for an unsustainable exercise of discretion. *Lavoie*, 152 N.H. at 547.

■■ Pursuant to RSA 626:5 (2007):

> It is an affirmative defense that the actor committed the offense because he was induced or encouraged to do so by a law enforcement official or by a person acting in cooperation with a law enforcement official, for the purpose of obtaining evidence against him and when the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it. However, conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

The general purpose of the affirmative defense of entrapment "is to prevent a defendant from being convicted of a crime manufactured by law enforcement officers." *State v. Bacon*, 114 N.H. 306, 308 (1974). While ordinarily entrapment raises an issue of fact to be determined by the jury, if the defendant fails to meet his burden of producing some evidence in support of the defense, the trial court should not submit the issue to the jury. *See id.* at 309; *see also Lavoie*, 152 N.H. at 547.

"Generally, the determination of whether a defendant has been entrapped is made by reference to one of two criteria, one a subjective test and the other an objective test." *State v. Little*, 121 N.H. 765, 769 (1981). The subjective test focuses upon the intent or predisposition of the defendant to commit the crime. *Id.* Under the subjective test, if the defendant is found to have been predisposed to commit the crime, the defense will fail. *Id.* Under the subjective test, the actions of government officials "are not critical factors" unless their conduct is so outrageous as to offend due process. *Id.* By contrast, the objective test focuses exclusively upon the conduct of law enforcement officials and their agents in providing the defendant with an opportunity to commit the crime. *Id.* at 770. Under the objective test, evidence of the defendant's predisposition to commit the alleged crime is irrelevant. *Id.*

■ In New Hampshire, "the determination of whether a legitimate entrapment defense exists . . . involve[s] elements of both the subjective and objective test." *Id.* at 771. Thus, we look at the conduct of law enforcement officials and their agents to determine whether they engaged in "the kind of conduct . . . [that] may . . . have induced the accused to commit the crime

charged." *State v. Groulx*, 106 N.H. 44, 47 (1964) (quotation omitted). We also examine the defendant's "own conduct and predisposition," *Little*, 121 N.H. at 772 (quotation omitted), to determine whether he was "ready to commit the crime" and the police only furnished him an opportunity to do so, *State v. Campbell*, 110 N.H. 238, 241 (1970).

Under New Hampshire law, therefore, the entrapment defense consists of two elements: (1) government inducement; and (2) the lack of predisposition on the part of the defendant to engage in the alleged criminal conduct. *See Little*, 121 N.H. at 771-72. In this respect, New Hampshire law comports with the law in the majority of jurisdictions. *See Mathews v. United States*, 485 U.S. 58, 62-63 (1988); *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993); *United States v. Jackson*, 345 F.3d 59, 66 (2d Cir. 2003), *cert. denied*, 540 U.S. 1157 (2004), *and cert. denied*, 541 U.S. 956 (2004); *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002), *cert. denied*, 537 U.S. 927 (2002); *United States v. Tejeda*, 974 F.2d 210, 217 (1st Cir. 1992); *State v. Verrecchia*, 766 A.2d 377, 387 (R.I. 2001). *See generally* 2 W. LAFAVE ET AL., CRIMINAL PROCEDURE § 5.2(a), at 562-64 (3d ed. 2007).

Because it is an affirmative defense, *see* RSA 626:5, the defendant bears the burden of proving entrapment by a preponderance of the evidence, *see* RSA 626:7 (2007). *Little*, 121 N.H. at 772. Thus, to be entitled to an instruction on entrapment, a defendant must produce "some evidence" on both prongs of the defense. *See Lavoie*, 152 N.H. at 547; *see also Tejeda*, 974 F.2d at 217; *Sparks v. State*, 603 A.2d 1258, 1283 (Md. Ct. Spec. App.), *cert. denied*, 610 A.2d 797 (Md. 1992). He must produce "some evidence" to support a rational finding that: (1) the charged offense was induced by government officials; and (2) he was not predisposed to engage in it. *See Lavoie*, 152 N.H. at 547; *Little*, 121 N.H. at 771-72. With these general principles in mind, we now analyze whether the trial court erred when it ruled that the defendant failed to meet this burden.

### 2. Inducement

"[I]nducement . . . goes beyond providing an ordinary opportunity to commit a crime." *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir.) (quotations omitted), *cert. denied*, 513 U.S. 1051 (1994); *see Jacobson v. United States*, 503 U.S. 540, 550 (1992); RSA 626:5 ("merely affording a person an opportunity to commit an offense does not constitute entrapment"). "An inducement, by its very nature, contemplates more than a request and an affirmative response." *Sparks*, 603 A.2d at 1283. "It is more than a solicitation. It is more even than a successful solicitation." *Id.* (citation omitted). "Thus, an agent deployed to stop the traffic in illegal

drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later." *Jacobson*, 503 U.S. at 549.

 "An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *Gendron*, 18 F.3d at 961.

> Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: (1) used intimidation and threats against a defendant's family; (2) called every day, began threatening the defendant, and were belligerent; (3) engaged in forceful solicitation and dogged insistence until defendant capitulated; (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms; (5) played upon sentiment of one former war buddy for another to get liquor (during prohibition); (6) used repeated suggestions which succeeded only when defendant had lost his job and needed money for his family's food and rent; [and] (7) told defendant that she (the agent) was suicidal and in desperate need of money. The background and context of each example illustrate possible government overreaching—of its having acted unfairly by employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

*Id.* at 961-62 (quotations, citations, brackets and ellipsis omitted).

Here, even if we view the evidence in the light most favorable to the defendant, it did not constitute "some evidence" to support a rational finding that the defendant was induced to commit the charged offenses. With respect to the charged offenses, there is no evidence at all that the undercover officer engaged in *any* improper inducement. Rather, even taking the defendant's testimony as true, the officer merely asked him for drugs. Mere solicitation is not inducement as a matter of law. *See Sparks*, 603 A.2d at 1283; *see also* RSA 626:5.

 While the defendant implies that he would never have sold cocaine to the officer had the police informant not induced him to return to his drug addiction by repeatedly doing drugs with him, his own testimony establishes that even before the informant contacted him, he had been "partying." This case is, thus, distinguishable from *Sherman v. United States*, 356 U.S. 369, 373 (1958), where the Court found inducement as a matter of law.

First, in *Sherman*, the informant targeted the accused after meeting him at a doctor's office where they were being treated for narcotics addiction. *Sherman*, 356 U.S. at 371. By contrast, the informant here knew the defendant because she had used drugs with him in the past and had observed him selling drugs to a mutual friend. Moreover, while the accused in *Sherman* was being treated for drug addiction and was trying to avoid drugs before being induced to sell them to the informant, the defendant had been using drugs within several days of the informant's first contact. *Id.* at 371, 376.

Further, in *Sherman*, before ever asking the accused to sell him drugs, the informant cultivated a relationship with the accused by running into him accidentally and allowing their conversation gradually to progress to their mutual attempts to overcome narcotics addiction. *Id.* at 373. Conversely, the informant here, knowing that the defendant had sold drugs in the past, called him "out of the blue" and asked him to sell drugs to her.

Also, in *Sherman*, the accused agreed to sell the informant drugs only after "a number of" repeated requests *and* after the informant solicited the accused's sympathy by feigning physical suffering due to withdrawal symptoms. *Id.* at 371. Here, the informant merely asked the defendant twice if he would sell drugs to her. The first time he was asked, the defendant said that he was not sure that he wanted to do it and that he had to think about it. The second time he was asked, within moments of the first time, he said "okay." He never said "no."

Additionally, in *Sherman*, the informant notified the police about the accused only after repeatedly buying drugs from him, while here, the informant notified the police before any sales took place. *Id.* Finally, in *Sherman*, the Court found inducement as a matter of law based upon the uncontroverted testimony of the government's witnesses, while here, the *sole* evidence supporting the defendant's entrapment defense is his own self-serving account. *Id.* at 373.

The only other inducement to which the defendant points concerns the sale to the informant for which he was never charged. The alleged inducement, viewed in the light most favorable to the defendant, is that the police informant asked him twice if he would sell cocaine to her, telling him that she had a "really good customer, Nick, who got a ball [of cocaine] every week," for whom she could not procure cocaine as usual because of time constraints. He testified that he assented because he believed that if he "helped her out" by selling her cocaine (to give to "Nick"), the amount of cocaine involved would enable him to keep a package for himself. As he testified:

> In the way of doing things at the time, generally speaking, you buy something for somebody and you take a piece for yourself.

And, you know, when the amount is a ball, two hundred dollars, well that's enough to be able to give someone, another wholesaler, a good deal and still keep some for yourself. . . . So, the anticipation was that I could help her out. I could keep a package. She could keep a package. And that would be the case. Not to say that once you start using drugs, you know, any purchase, any chance to get a hit is enough. But for someone out of the blue to call you, two hundred dollars would be like a minimum amount, you know. It's just, you know, that you could do it.

■■■ None of this constitutes improper inducement. That the informant asked the defendant twice is not inducement. See Sparks, 603 A.2d at 1283; see also State v. Trujillo, 883 P.2d 329, 332 (Wash. Ct. App. 1994), rev. denied, 892 P.2d 1088 (Wash. 1995). Nor is it inducement that the defendant was lured by the promise of a good cocaine customer and the ability to keep some of the cocaine for himself.

The defendant's failure to produce "some evidence" that he was induced to commit the charged offenses is fatal to his claim that he was entitled to a jury instruction on entrapment. Accordingly, we need not address the sufficiency of the defendant's proof that he was not predisposed to commit the charged offenses.

### B. Motions to Dismiss

#### 1. State Constitution

The defendant next asserts that the trial court erred by denying his motion to dismiss on the ground that the police violated Part I, Article 8 of the New Hampshire Constitution. Part I, Article 8, however, concerns open government and is not pertinent here. This argument, therefore, lacks merit and warrants no extended consideration. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

#### 2. Federal Constitution

■■■ The defendant also argues that dismissal was required because the police violated his due process and equal protection rights under the Federal Constitution by not arresting him after the first sale, thereby permitting him to continue to sell and consume drugs, which damaged his health and society generally. "There is no [federal] constitutional right to be arrested," and the police need not halt a criminal investigation as soon as they have the minimum evidence necessary to establish probable cause. Hoffa v. United States, 385 U.S. 293, 310 (1966). We conclude, therefore, that the trial court did not err when it denied the defendant's motions to dismiss.

## C. Motions for Continuance and Discovery

■ Finally, the defendant contends that the trial court erred when it denied his request for a continuance and initially denied without prejudice his motion for additional discovery about the informant. "The trial court has broad discretion in managing the proceedings before it," *In the Matter of Connor & Connor*, 156 N.H. 250, 252 (2007), including pre-trial discovery, *State v. Emery*, 152 N.H. 783, 789 (2005). We will disturb decisions about pre-trial discovery and motions to continue only if the defendant demonstrates that the decision was clearly unreasonable to the prejudice of his case. *See State v. Jaroma*, 137 N.H. 562, 571-72 (1993); *Emery*, 152 N.H. at 789. We conclude that the denials of his request for a continuance and his motion for more discovery were not unsustainable exercises of discretion.

■ The record reveals that one week before trial, the trial court granted the defendant's request to proceed *pro se* and to retain his attorney as stand-by counsel. At the hearing on this request, the defendant asked for a one-month continuance so that he could "review courtroom procedures" and file certain discovery motions. The trial court denied the request for a continuance because the defendant had a week before the trial to prepare, almost all of the motions for discovery that he had filed lacked merit, and his attorney was still available to assist him as stand-by counsel. We hold that this was not an unsustainable exercise of discretion.

■ With respect to his motion for additional discovery about the informant, the record shows that once the State opened the door to her testimony, the trial court *granted* the defendant's request for discovery and gave him time to review it before any questioning. Given this record, the defendant has failed to demonstrate that the trial court's initial denial without prejudice of his motion for additional discovery constituted an unsustainable exercise of discretion.

Although on appeal, the defendant contends that by denying his request for a continuance and motion for additional discovery, the trial court deprived him of due process, he has failed to demonstrate that he preserved this argument for our review. We therefore decline to consider it. *See Petition of State of N.H. (State v. San Giovanni)*, 154 N.H. 671, 677 (2007).

*Affirmed.*

DUGGAN, GALWAY and HICKS, JJ., concurred.