Rockingham
No. 2009-010

THE STATE OF NEW HAMPSHIRE

v.

KATHERINE MENDOLA

Argued: June 15, 2010
Opinion Issued: July 23, 2010

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, J. The defendant, Katherine Mendola, was convicted by a jury of criminal solicitation to commit murder, *see* RSA 629:2 (2007); RSA 630:1 (2007). On appeal, she argues that the Superior Court (*Nadeau*, J.) erred when it failed to instruct the jury on entrapment, excluded evidence that her sometimes boyfriend had abused her, and admitted evidence that she wanted two additional people to be killed. We affirm.

The jury could have found the following facts. The woman the defendant sought to have killed was the wife of her workers' compensation lawyer. She first hired this attorney in late 2004 or early 2005. Over time, she developed romantic feelings for him, which she expressed by calling him repeatedly and by saying inappropriate things to him, such as referring to her cleavage, describing herself as "young," "hot," and "sexy," and telling him that she would make "the best wife in the whole wide world." Between September 1 and November 1, 2007, the defendant called her attorney 458 times. In one of her many visits to his office, the defendant embraced him and told him that she wanted to have a romantic relationship with him. Although he demurred, the defendant told others that they had kissed.

The defendant talked about her attorney to her friends "all the time," telling them that she loved him and wanted to marry him. She said that her attorney yearned to be with her, but that he did not want to disrupt his marriage. The defendant then sought to break up her attorney's marriage.

At first, she tried magic spells that she ordered from witchcraft websites. When these did not work, she sought to hire someone to kill her attorney's wife.

She first asked T. Thomas Austin, who lived at the same campground as the defendant. In the summer of 2007, she twice asked Austin to "eliminate" her attorney's wife because she was in love with her attorney and wanted to marry him. Austin declined. She then asked Daniel Cloutier, with whom she sometimes lived, if he knew of someone who could do the job. Although Cloutier initially did not take the defendant seriously, he became concerned that she might be capable of hurting someone when she threatened him with a knife because he left a mess in the bathroom.

Cloutier contacted agents from the drug task force for the New Hampshire Attorney General in October 2007. Ten years earlier, he had been an informant for the task force for approximately one year. Cloutier told two task force agents that he had a roommate who wanted to hire an assassin to kill the wife of a man with whom she was having an affair. The agents spoke with the state police, and, as a result, State Trooper Christopher Huse was assigned to pose as a hit man. Huse first met with Cloutier, who told him that the defendant was his roommate and that she wanted a hit man to kill her attorney's wife. Huse told Cloutier to tell the defendant that he knew someone who would contact her about the job. The defendant seemed "overjoyed" when Cloutier told her this.

On November 16, 2007, Huse called the defendant, posing as a hit man, and asked if she were still interested in his services, to which she said, "Yes, I am." When the defendant told Huse that she'd rather talk in person, he told her that they would meet in New Hampshire and that he would call her when he was "ready." Huse told the defendant that "business is gonna be taken care of," to which she said, "I appreciate that," and laughed.

Huse called the defendant again on November 19, 2007. The defendant told him that nobody knew "about this" except Cloutier and that when she and Huse met she was planning to wear "a hood and sunglasses so [she wouldn't] be recognizable." She told Huse that where they were going for the hit was within a twenty-minute ride from Manchester, but was "out in the middle of nowhere so nobody is gonna see nothing." She told Huse not to worry because she had "directions to where we're going" and that she had "thought, like, ten steps ahead here." Huse asked the defendant if she still "want[ed] to do this," to which she replied, "I'm very serious about this." They agreed to meet that afternoon in Manchester.

Later that day, Huse and the defendant met in the parking lot of a Wendy's restaurant in Manchester. The defendant told Huse that she thought this was "funny" because "[t]he name of [the wife] is Wendy." The defendant told Huse that she'd "been waiting for this for five years." When

Huse asked why she had not hired him earlier, she said: "I just found out about you . . . . If I had known about you a year ago, . . . I would have jumped on this sooner." She explained that she had been asking Cloutier for a month to "get this done."

The defendant further explained that she "kn[e]w what [she was] doing" because she had talked to a well-known psychic who had told her: "You need to get rid of this woman. I'm not going to tell you specifically how. You know how. You need to get rid of her." When Huse again asked the defendant if this was what she wanted to do, she said that she was a "hundred and million percent" sure that it was.

The defendant reiterated that she "want[ed] this done really bad," explaining, "I want [the wife] out so that I [can] get married and I am in a lot better situation and . . . he has money and . . . [h]e wants to be with me. He doesn't want her. She sucks his money, and, you know, she needs to go." The defendant said that "when things settle down" and her attorney "gets over all . . . that's just happened," she would "move in with him." She told Huse that when she married her attorney, she would be able to pay Huse more. The defendant told Huse that she was "going [to] reward [him] handsomely" and that she had "a thousand dollars in cash for [him] to get the job done." Huse explained that a thousand dollars might suffice if the defendant merely wanted Wendy to be hurt, to which the defendant replied: "I want her dead." Huse explained that for a killing, the defendant would need to pay him an additional three or four thousand dollars, to which the defendant said: "I got ya." She told Huse that she could give him a thousand dollars now, but that "[t]he guy's a lawyer. He's got to be cool. . . . He doesn't know about this. . . . When things go the way I want them to go, she's going to be out, I'm going to be in. I can have more money for you later." Huse repeated: "I just want to make sure that we're on [t]he same page. . . . That this first payment of the thousand dollars to kill her isn't just the only payment; there's going to be more." The defendant agreed.

Huse asked the defendant whether there was "[a]nything specific that [she] want[ed]," to which she replied: "I want her dead and I want it to look like an accident . . . . " She explained that her attorney's wife "needs to die. . . . She can't be like hurt or injured or like in a hospital. She needs to be down and out." She suggested that Huse "yell out, 'Wendy,' to see if she turns," and then "shoot her." She told Huse that her attorney "usually leaves work around 3:00, 3:30," so that the "best time to do it" was "in the morning." She suggested that Huse "somehow stalk" her attorney's wife and "figure out when she leaves the house every day or wait for her to come out of the house . . . [a]nd then you got to shoot her." When Huse asked whether the defendant wanted the woman to be shot in the chest or the

head, the defendant said: "The head's the best because . . . . [p]eople rarely survive head shot gun wounds. . . . We want her gone, so do it in the head, if you can."

The defendant then expressed her concern that, because she called her attorney's office "all the time" and wrote love letters to him, she could be a suspect in his wife's death. She explained that she hoped that Huse would tell her "when this is going to take place" so that she could "hop on a plane and go down to Florida and disappear for [a] while."

After the defendant met with Huse, she returned to her home and told Cloutier, excitedly, "[I]t's definitely going down." Some days later, Huse called the defendant and asked her to meet him so that she could identify her attorney's wife in a photo that he had obtained. Huse and the defendant agreed to meet in Milford, where the police arrested her.

At trial, defense counsel told the jury in his opening statement that this case was about "the control carefully, methodically and purposely" wielded over the defendant by Cloutier. The defendant's theory of the case, as explained in defense counsel's opening statement, was that Cloutier physically, verbally and sexually abused her for many years, and then, because he wanted to be rid of her, set her up to be arrested for solicitation of murder. "Comply or die," is what defense counsel said Cloutier told the defendant. But for Cloutier's "abuse, . . . threats and . . . manipulati[on]," the defendant "would not have stepped into [Huse's] truck." As defense counsel explained, the defendant "was not predisposed to do this. She only did it because she was forced to comply or die." Consistent with this theory, the defendant testified that Cloutier told her that he would kill her if she did not do as he said. She testified that Cloutier told her that he wanted to be rid of her and "was going to be an informant and set [her] up with the drug task force."

The defendant first argues that the trial court erred when it failed to instruct the jury on entrapment. We review the trial court's decision not to give a jury instruction for an unsustainable exercise of discretion. *State v. Ayer*, 154 N.H. 500, 514 (2006), *cert. denied*, 552 U.S. 834 (2007). To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of her case. *State v. Duran*, 158 N.H. 146, 150 (2008). We will search the record for evidence supporting the defendant's requested jury instruction. *State v. Balliro*, 158 N.H. 1, 5 (2008).

For a defendant to be entitled to an instruction on a specific defense, there must be some evidence to support a rational finding in favor of that defense. *Duran*, 158 N.H. at 150. " 'Some evidence' means more than a minutia or scintilla of evidence." *Id.* (quotation omitted). "To be more than a scintilla, evidence cannot be vague, conjectural, or the mere suspicion

about the existence of a fact, but must be of such quality as to induce conviction." *Id.* (quotation omitted). "Where there is simply no evidentiary basis to support the theory of the requested jury instruction, the party is not entitled to such an instruction, and the trial court may properly deny the party's request." *Balliro*, 158 N.H. at 5 (quotation and ellipsis omitted).

■■ Entrapment is an affirmative defense, upon which the defendant bears the burden of proof:

> It is an affirmative defense that the actor committed the offense because he was induced or encouraged to do so by a law enforcement official or by a person acting in cooperation with a law enforcement official, for the purpose of obtaining evidence against him and when the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it. However, conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

RSA 626:5 (2007). To be entitled to an instruction on this defense, a defendant must point to "some evidence" that: (1) law enforcement officials induced or encouraged the defendant to commit the offense; and (2) the defendant was not predisposed to engage in it. *State v. Larose*, 157 N.H. 28, 35 (2008).

■ We begin by addressing the first prong of the defense — inducement. Inducement is something more than "merely affording a person an opportunity to commit an offense." RSA 626:5; *see Larose*, 157 N.H. at 35. Rather, "[a]n inducement consists of an 'opportunity' *plus* something else — typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *Larose*, 157 N.H. at 36 (quotation omitted).

■ Here, even if we view the evidence in the light most favorable to the defendant, we fail to find "some evidence" that would support a rational finding that the defendant was induced by law enforcement to commit the charged offense. There was no evidence that Huse did anything other than offer his services to the defendant. "An inducement, by its very nature, contemplates more than a request and an affirmative response." *Id.* at 35 (quotation omitted). "It is more than a solicitation. It is more even than a successful solicitation." *Id.* (quotation omitted).

■■ While the defendant argues that Cloutier threatened her, his acts could only possibly constitute inducement if they occurred during the very brief period of time in which he acted as a government agent. *See Sherman*

*v. United States,* 356 U.S. 369, 373-74 (1958); RSA 626:5. At most, Cloutier acted as a government agent when, at Huse's direction, he told the defendant that he had talked with a hitman from whom she should expect a call. The only evidence that, during this specific period of time, Cloutier in any way threatened the defendant came from her own self-serving account. The defendant failed to produce any corroborating evidence about the abuse. The defendant's testimony, standing alone, does not constitute "some evidence" to support her requested instruction. *See Larose,* 157 N.H. at 33. A court need not give weight to allegations that are intrinsically improbable or flatly contradicted by irrefutable evidence. *Id.* Moreover, conclusory and self-serving statements, standing alone, do not suffice. *Id.* "[A] defendant's account, although self-serving, may have weight if it is interlaced with considerable detail and has some circumstantial corroboration in the record." *Id.* (quotation omitted).

The defendant's failure to produce "some evidence" that she was induced to commit the charged offense by law enforcement officials is fatal to her claim that she was entitled to a jury instruction on entrapment. Accordingly, we need not address the sufficiency of the defendant's proof that she was not predisposed to commit the charged offenses. *See id.* at 38.

The defendant next asserts that the trial court erred by allowing the State to introduce evidence that she would "love" to hire Huse in the future to kill two other people: her biological father and another woman whom she disliked. The defendant argues that the trial court's ruling violated New Hampshire Rule of Evidence 404(b).

Although the State argues that the defendant failed to preserve this argument for our review because her motion *in limine* cited Rule 404(a), instead of Rule 404(b), we disagree. The text of the defendant's motion and the transcript of the hearing upon it make clear that she raised her argument under Rule 404(b) and cited Rule 404(a) by mistake.

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have established a three-part test for the admissibility of evidence under Rule 404(b): (1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the act; and (3) the probative

value of the evidence must not be substantially outweighed by its prejudice to the defendant. *State v. Beltran*, 153 N.H. 643, 647 (2006). The State bears the burden of demonstrating the admissibility of other bad acts. *Id.* We review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case. *Id.* The defendant challenges the trial court's decision with respect to the first and third prongs.

To meet its burden under the first prong, the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which it will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity. *Id.* To be relevant, other bad acts must be in some significant way connected to material events constituting the crime charged and not so remote in time as to eliminate the nexus. *Id.* at 647-48. Here, the challenged evidence was relevant not only to rebut the defendant's entrapment defense, but also to establish that she possessed the requisite criminal intent to commit the charged crime.

The contested evidence was specifically relevant to show that the defendant, contrary to her assertions, was predisposed to commit the crime of criminal solicitation. *See United States v. Santiago*, 566 F.3d 65, 71-72 (1st Cir.) (prior conviction of possession of cocaine admissible to rebut entrapment defense to drug possession charge), *cert. denied*, 130 S. Ct. 338 (2009). While the defendant contends that the trial court erred by allowing the State to introduce the challenged evidence during its case-in-chief *before* the defendant could present sufficient evidence of her entrapment defense, we agree with the State that this argument is not preserved for our review, and decline to address it.

The contested evidence was also relevant to show that the defendant possessed the required criminal intent for criminal solicitation, which is that she acted purposely. RSA 629:2, I. "A person acts purposely . . . when [her] conscious object is to cause the result or engage in the conduct that comprises" the offense. RSA 626:2, II(a) (2007). Evidence that the defendant sought to hire Huse to kill other people tended to show that when she hired Huse to kill her attorney's wife, she did so with the purpose of having her attorney's wife killed. This evidence showed that she did not solicit Huse to kill her attorney's wife only because, as she claimed, Cloutier forced her to do so, but because she personally wanted the wife to be killed, just as she wanted two other people whom she disliked to be killed.

Under the third prong, evidence of other bad acts is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh

the probative value of the evidence. *Beltran*, 153 N.H. at 649. Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case. *Id.* It is not, however, evidence that is merely detrimental to the defendant because it tends to prove guilt. *Id.* We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b). *Id.* To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of her case. *Id.*

■ Here, in light of the defendant's entrapment defense and her theory that, but for Cloutier's abuse and threats, she lacked the requisite criminal intent to commit the charged crime, we cannot say that the trial court unreasonably balanced the prejudicial effect and probative worth of evidence that the defendant asked Huse to kill people other than her attorney's wife. In the context of this case, this evidence was highly probative both because it rebutted the defendant's entrapment defense and because it established that she, in fact, had the requisite criminal intent. Even though the evidence was prejudicial, the defendant has not shown that the trial court erred in concluding that its probative value was not substantially outweighed by the danger of unfair prejudice.

■ Finally, the defendant contends that the trial court erred when it precluded her from introducing evidence that Cloutier abused her. We defer to the trial court in determining the admissibility of evidence absent an unsustainable exercise of discretion. *State v. Dodds*, 159 N.H. 239, 250 (2009). We will not reverse its decision unless the defendant demonstrates that it was clearly unreasonable to the prejudice of her case. *Id.* at 251. The record reveals that the trial court, in fact, allowed the defendant to testify, at length, about Cloutier's alleged abuse. While the trial court precluded the defendant from presenting witnesses to testify that she told them that Cloutier abused her, the defendant has failed to show that this decision was clearly untenable or unreasonable to the prejudice of her case. We decline to address the defendant's assertion that the trial court's decision violated her constitutional right to present all proofs favorable, *see* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI, because she did not brief this argument sufficiently for our review. *See State v. Blackmer*, 149 N.H. 47, 49 (2003).

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.