Hillsborough-southern judicial district
No. 2007-611

THE STATE OF NEW HAMPSHIRE

v.

DIEGO DURAN

Argued: October 15, 2008
Opinion Issued: December 5, 2008

148

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, attorney, on the brief and orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief, and *Theodore Lothstein*, assistant appellate defender, orally, for the defendant.

DUGGAN, J. After a jury trial in the Superior Court (*Hampsey*, J.), the defendant, Diego Duran, was convicted of manslaughter. *See* RSA 630:2 (2007). He appeals his conviction, arguing that the State presented insufficient evidence to support a jury instruction on accomplice liability. *See* RSA 626:8, III (2007). He also appeals the trial court's decision to exclude from the calculation of his pretrial confinement credit time he spent awaiting extradition from Colombia. *See* RSA 651:3, I (2007); RSA 651-A:23 (2007). We affirm in part, reverse in part and remand.

The following facts appear in the record. In October 2002, the defendant, a Colombian national, was living in Nashua. Zulkerine Torres and Frank Ledesma lived next door in a house owned by Simon Concepcion. On the evening of October 26, they invited the defendant out to Tu Casa, a restaurant and nightclub in Nashua. While at the club, the defendant was introduced to Luis Otero Rivera (Otero), another Colombian national. The defendant and Otero were from regions with a history of animosity toward each other, and began arguing over which region was better, trading insults and epithets. Eventually, the two stopped arguing but continued to drink heavily.

Later, the defendant and Otero resumed their argument outside Tu Casa. The defendant punched Otero, who fell to the ground. The defendant went into the club and returned with Concepcion. Otero was still on the

ground in the alley. The defendant grabbed onto a ledge on a wall and used it to steady himself as he jumped on Otero's head. Concepcion admitted that his foot touched Otero's head at some point, leaving blood on his shoe. The defendant and Concepcion then reentered the club.

Back inside, Concepcion told Ledesma they had beaten somebody up, asked if he wanted to see and showed him the body. Later, Ledesma saw Concepcion speaking with a group of people and making a stomping motion with his foot while talking.

A patron later found Otero in the alley and told the owner to call the police. When the police arrived, Ledesma, Concepcion and the defendant went out the back. The police found Otero alive, but unconscious. He died about six weeks later. The medical examiner ruled the death a homicide caused by blunt force head trauma resulting from at least two blows.

After Torres left the club, she met Ledesma and Concepcion and drove them to a party. Ledesma then asked her to go buy cigarettes for him. En route, she saw the defendant and stopped to give him a ride. He got into the back of her car, telling her he did not want to sit in the front because people were looking for him. When they heard a helicopter, he told Torres to drive faster, saying the helicopter was looking for him because he had just killed that "hijo de puta" (son of a bitch). He said he had struck Otero in the head, threw him against a wall and kicked him. He offered to show Torres the blood on his shoes, but she was unable to see. Later that night, Concepcion passed out. Ledesma carried him home and noticed blood on his shoe.

Some time after the assault, the defendant went to a friend's house to sleep and borrow some money. While speaking with his friend, he said that he had killed somebody in Nashua. Later, he told another friend that he had been in a fight with another Colombian and had punched him in the face and kicked him in the head. The defendant eventually returned to Colombia.

Colombian authorities arrested him on May 3, 2004, on an international arrest warrant. After his arrest, the defendant challenged his extradition to New Hampshire. On March 17, 2005, Colombia granted extradition, and on October 21, 2005, the defendant was transferred from Colombia to New Hampshire. The Nashua detective accompanying him on his flight from Miami to New Hampshire testified that the defendant said, "That thing up there in Nashua, I was drunk and I had been taking drugs."

At the conclusion of the trial, the State requested a jury instruction on accomplice liability. The trial court, over the defendant's objection, gave the instruction. The jury returned a guilty verdict on manslaughter. The trial court sentenced the defendant to fifteen to thirty years in prison. During the sentencing hearing, the defendant argued that his time spent awaiting extradition in Colombia should be credited toward his pretrial confinement.

Relying upon our decision in *State v. Harnum*, 142 N.H. 195 (1997), the trial court refused to grant pretrial confinement credit for any time prior to the Nashua Police taking custody of the defendant in Miami. This appeal followed.

On appeal, the defendant makes two arguments. First, he argues that there was insufficient evidence to support a jury instruction on accomplice liability. Second, the defendant argues that he should have been credited for his pretrial confinement while awaiting extradition from Colombia and asks us to overrule our decision in *Harnum*.

I

■ A trial judge's decision to give a jury instruction must be based upon "some evidence to support a rational finding in favor of that [instruction]." *State v. Larose*, 157 N.H. 28, 33 (2008) (quotation omitted). " 'Some evidence' means more than a minutia or a scintilla of evidence." *Id.* "To be more than a scintilla, evidence cannot be vague, conjectural, or the mere suspicion about the existence of a fact, but must be real and of such quality as to induce conviction." *Id.* (quotation omitted). The trial judge's decision to give the State's requested instruction on accomplice liability must, therefore, have been based upon some evidence in the record to support a rational finding of accomplice liability.

We review a trial court's decision to give a jury instruction for an unsustainable exercise of discretion. *State v. Lavoie*, 152 N.H. 542, 547 (2005). To prevail, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *State v. Yates*, 152 N.H. 245, 249 (2005).

RSA 626:8 provides, in relevant part:

III. A person is an accomplice of another person in the commission of an offense if:

(a) With the purpose of promoting or facilitating the commission of the offense, he solicits such other person in committing it, or aids or agrees or attempts to aid such other person in planning or committing it;

. . . .

IV. Notwithstanding the requirement of a purpose as set forth in paragraph III, when causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

■ The State must prove the elements of both section III and section IV. *State v. Anthony*, 151 N.H. 492, 493-95 (2004). Section III contains dual requirements that the defendant act with the purpose of promoting the commission of the offense and that he actually solicit or aid or attempt to aid another in its commission. Thus, to prove accomplice liability, the State must prove that: (1) the accomplice had the purpose to make the crime succeed; (2) the accomplice's acts solicited, aided or attempted to aid another in committing the offense; and (3) under section IV, the accomplice shared the requisite mental state for the offense. *Anthony*, 151 N.H. at 493-95; *see State v. Burke*, 122 N.H. 565, 570 (1982); *State v. Goodwin*, 118 N.H. 862, 866 (1978).

The defendant argues there was no evidence upon which to base the request for the accomplice liability instruction. He argues that any testimony Ledesma offered at trial about the defendant and Concepcion's complicity was rebutted by Ledesma's prior deposition testimony, leaving the jury to speculate as to any relationship between the two. He argues that the State's theory throughout the case was that the defendant caused Otero's death and the State never introduced evidence tending to show he was an accomplice with Concepcion, while the defense argued Concepcion had committed the crime alone.

■ We begin by noting that even if the State's theory at trial focused on the defendant as the primary actor, we have previously determined that such a theory puts the defendant on notice to prepare a defense as to principal or accomplice liability. *See State v. Barton*, 142 N.H. 391, 395 (1997) (noting abandonment of common law distinctions between principal and accomplice, and holding that indictment as a principal "is sufficient to allow defendant to prepare a defense to the substantive offense for principal or accomplice liability"). The issue before us is whether there is sufficient evidence to warrant an instruction on accomplice liability. The fact that the State's primary theory at trial was that the defendant acted as a principal does not change our analysis.

■ After reviewing the evidence, we conclude that there was "some evidence" supporting all three elements of accomplice liability. First, the State introduced evidence that the defendant had the purpose to make the crime succeed. *See Goodwin*, 118 N.H. at 866-67 (defendant's presence had the purpose of ensuring the crime succeeded by encouraging the other offender). Concepcion testified that he was present when the defendant kicked Otero and there was testimony from multiple witnesses that Concepcion had blood on his shoe after the event. Ledesma testified that Concepcion told him "they" had beaten somebody in the alley. The defendant argues that this testimony was rebutted by Ledesma's deposi-

tion testimony. This argument, however, goes to the credibility of the witness and the proper weight to be given to the evidence, not the sufficiency of the evidence to warrant an instruction. *See State v. Huard*, 138 N.H. 256, 259 (1994) ("Common sense evaluation of the credibility of witnesses . . . is the province and obligation of the jury."). The State thus introduced evidence that the defendant was in the alley for the purpose of making the crime succeed and not as a mere bystander, satisfying the first element.

Second, the State introduced evidence that Concepcion and the defendant were in the alley together, and that the latter jumped up and down on Otero's head. Indeed, the defendant told Torres that he had struck Otero in the head, threw him against a wall and kicked him. Such acts aided the commission of the offense, supporting the second element. *See Burke*, 122 N.H. at 570 (defendant aided armed robbery when arrived with others, was present during robbery, threatened to tear telephone from the wall, and left with two other defendants).

Finally, the State presented evidence showing that the defendant possessed the requisite mens rea for manslaughter, recklessness. *See* RSA 630:2, I(b); RSA 626:2, II(c) (2007). As noted above, there was testimony that the defendant repeatedly jumped up and down on Otero's head as he lay unconscious in the alley. There was, therefore, "some evidence" that would support a rational conclusion that the defendant acted recklessly.

Because there was more than a minutia or scintilla of evidence supporting all three requirements for accomplice liability, it was not an unsustainable exercise of discretion for the trial judge to give the instruction.

II

The defendant next argues that we should overrule our decision in *Harnum*, thereby entitling him to credit for his pretrial confinement in Colombia while awaiting extradition.

In *Harnum*, the defendant was arrested in Florida for a New Hampshire probation violation and later extradited to New Hampshire, tried and convicted. *Harnum*, 142 N.H. at 196. The court held that a defendant receives pretrial confinement credit only for that time spent "awaiting and during trial" and in the "custody" of New Hampshire authorities. *Id.* at 197-98.

*Harnum* construed RSA 651-A:23 (1996) and RSA 651:3, I (1996) to conclude that a defendant is awarded pretrial credit only for time spent in the physical custody of New Hampshire authorities, and not that "awaiting extradition." *Id.* RSA 651:3, I, provides, in relevant part:

> All the time actually spent *in custody* prior to the time [the defendant] is sentenced shall be credited in the manner set forth in RSA 651-A:23 against the maximum term of imprisonment that is imposed and against any minimum term authorized by RSA 651:2 or 6.

(Emphasis added.) RSA 651-A:23 provides, in relevant part:

> Any prisoner who is confined to the state prison, any house of correction, *any* jail or *any other place* shall be granted credit against both the maximum and minimum terms of his sentence equal to the number of days during which the prisoner was confined in jail *awaiting and during trial* prior to the imposition of sentence and not under any sentence of confinement.

(Emphasis added.)

*Harnum* focused upon the phrases "awaiting and during trial" in RSA 651-A:23 and "in custody" in RSA 651:3, I. *Harnum*, 142 N.H. at 197-98. *Harnum* reasoned that "awaiting trial," by its plain meaning, could not mean awaiting extradition and thus did not encompass the defendant's time awaiting extradition from Florida. *Id.* at 197. Furthermore, *Harnum* said that a defendant received credit only so long as he was "in custody." *Id.* at 198. The defendant was not in custody "for purposes of New Hampshire law" while under Florida authority because the term custody "necessarily presupposes a form of custody over which New Hampshire can exercise its control." *Id.* at 198. The trial court in this case reached the correct result under our holding in *Harnum*.

██ ██ We do not lightly overrule a prior opinion. *Alonzi v. Northeast Generation Servs. Co.*, 156 N.H. 656, 659 (2008). "The doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." *Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 504 (2003) (quotation omitted). "Thus, when asked to reconsider a holding, the question is not whether we would decide the issue differently *de novo*, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed." *Id.* at 504-05 (quotation omitted). Several factors inform our judgment of whether a decision has come to be seen as such an error, including: (1) whether the rule has proven to be intolerable simply in defying practical workability; (2) whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling; (3) whether related principles of law have so far developed as to have left the old rule no more than a remnant of

abandoned doctrine; and (4) whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification. *Id.* at 505 (quotations omitted). These factors guide our judgment, but no single factor is wholly determinative.

The defendant argues that *Harnum* is inconsistent with the development of the law and is, as a rule, unworkable. He argues that the fact that a majority of jurisdictions allow such credit weighs in favor of our adopting a new rule today. At oral argument, he also argued that *Harnum* was tailored to its own facts and does not provide sound precedent for future cases. In particular, he argues, *Harnum* means that defendants awaiting arraignment, probable cause hearings, sentencing hearings or probation hearings would not receive credit for their confinement because they are not "awaiting trial" within the narrow confines of the decision.

The State responds that *Harnum* is hardly unworkable, as it provides clear guidance to courts as to what time will be credited in distinguishing "awaiting extradition" from "awaiting trial." As for the defendant's arguments concerning awaiting other judicial proceedings, the State argues these are controlled by other statutes and should have no bearing upon our analysis. *See* RSA 651-A:19 (2007) (concerning credit for parolees).

We agree with the defendant that *Harnum* should be overruled. We believe there are principles of law the *Harnum* court did not consider. We also recognize the vast majority of jurisdictions have decided to the contrary and that no party has relied upon our prior holding so as to lend a special hardship to the consequences of overruling.

"[We] are sometimes able to perceive significant facts or understand principles of law that eluded [our] predecessor and justify departures from existing decisions." *Planned Parenthood v. Casey*, 505 U.S. 833, 866 (1992). Here, departure from *Harnum* is justified because the majority opinion failed to give full consideration to the plain language in RSA 651-A:23, which states that a prisoner shall be granted credit for time spent in "the state prison, *any* house of corrections, *any* jail or *any other place* . . . ." (Emphasis added.)

Although both the majority and dissenting opinions quote this language, neither analyzes the text or seems to consider it relevant. Instead, *Harnum* focused on the language "in custody" in RSA 651:3, I, and "awaiting and during trial" in RSA 651-A:23. In doing so, it construed custody to mean solely New Hampshire custody and awaiting trial to exclude awaiting extradition. By making these definitions the linchpin of its analysis, the court saw no need to discuss the "any jail or any other place" language in RSA 651-A:23. The location of the custody was irrelevant because the

determining factor was who controlled the custody and the status of the defendant's case. This analysis, however, does not read RSA 651:3, I, and RSA 651-A:23 as a whole.

If the majority's reading is correct, the legislature's addition of "any jail or any other place" is superfluous language. The legislature, however, is presumed not to use superfluous language. *N.H. Ins. Guar. Ass'n v. Pitco Frialator*, 142 N.H. 573, 578 (1998). Thus, an interpretation that renders statutory language superfluous and irrelevant is not a proper interpretation. By appraising this language as irrelevant, *Harnum* failed to follow the well-recognized rules of statutory interpretation.

When interpreting statutes, we look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *DaimlerChrysler Corp. v. Victoria*, 153 N.H. 664, 666 (2006). We do not pick and choose those portions of the language we find controlling and subvert those we do not; we read the statute as a whole. *See id.* We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.* Nor will we interpret statutory language in a literal manner when such a reading would lead to an absurd result. *Great Traditions Home Builders v. O'Connor*, 157 N.H. 387, 388 (2008).

RSA 651:3, I, states that a defendant who is "in custody" "shall be credited in the manner set forth in RSA 651-A:23." Its plain language thus directs one to RSA 651-A:23 to determine who is eligible to receive confinement credit. RSA 651-A:23, in turn, states that "any prisoner who is confined to . . . any jail or any other place shall be granted credit." By reading RSA 651:3, I, in isolation, *Harnum* construed "in custody" to render irrelevant the "any jail or any other place" language in RSA 651-A:23. The statute, however, makes no distinction between in-state and out-of-state custody, nor does it distinguish between in-state and out-of-state jails. We will not add words that the legislature did not see fit to include, nor delete those that it did.

Had the *Harnum* court properly perceived the significance of that statutory language, it would have been difficult to reach the result it did. As Justice Powell wrote in his concurring opinion in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), "we owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations." *Monell*, 436 U.S. at 709 n.6 (Powell, J., concurring).

Furthermore, *Harnum's* interpretation of "awaiting trial" is the kind of literal interpretation that leads to an absurd result. Instead, we are persuaded by the dissent in *Harnum*. The dissent stated:

> The majority . . . [reasons] that granting credit to this defendant would require modification of RSA 651-A:23 by adding the

words "while awaiting extradition." The unstated assumption behind this putative dichotomy is the debatable notion that one cannot be "awaiting extradition" while "awaiting trial." Taken to its extreme, the majority's argument would also deny credit to those who are "awaiting indictment," "awaiting arraignment," or "awaiting a competency determination." It is always possible to slice off some preliminary phase of a criminal proceeding and announce that the time was not spent "awaiting trial." This arbitrary application of labels has, however, been eschewed by this court in the past, as we have noted that application of a label does not alter or diminish the event's consequence to the defendant. . . . Substantive evaluation of the character of the time period in question compels the conclusion that time spent awaiting extradition is time spent under the control of the State prior to trial, and the defendant is therefore entitled to credit.

*Harnum*, 142 N.H. at 200-01 (Broderick, J., dissenting) (quotations and brackets omitted).

■ The majority's reading of the statute was flawed. Because it is technically only after indictment that a defendant is "awaiting trial," *Harnum* would presumably not grant credit for time spent in jail between the arrest and indictment. Such a reading of the statute makes little sense. Rather, "awaiting and during trial" encompasses all time from the moment of arrest through the completion of the trial and sentencing. In so holding, we join the overwhelming majority of jurisdictions that have decided this issue.

■ At least thirty-nine other jurisdictions give credit in similar circumstances. The defendant argues that *Harnum's* rule should thus be seen as "no more than a remnant of abandoned doctrine." *See Jacobs*, 149 N.H. at 505; *Nieto v. State*, 70 P.3d 747, 748 n.7 (Nev. 2003) (listing the jurisdictions). "[T]he overwhelming majority of states allow for the granting of credit for time served in presentence confinement while awaiting extradition when the sole reason for the foreign incarceration is the offense for which the defendant is ultimately convicted and sentenced." *Nieto*, 70 P.3d at 748. At least three states have decided the issue since we decided *Harnum*; all three rejected *Harnum*. *See Nieto*, 70 P.3d at 748; *State v. Cooper*, 990 P.2d 765 (Kan. App. 1999); *State ex rel. Curry v. Thompson*, 967 P.2d 522 (Or. 1998). Indeed, the Nevada Supreme Court expressly rejected *Harnum's* reasoning, stating, "the reasoning in *Harnum* [is] unpersuasive." *Nieto*, 70 P.3d at 748.

It appears the *Harnum* court was aware of some level of disagreement over the proper scope of pretrial confinement credit, but the decision does not recognize that it is virtually alone in reaching such a result. The vast support for granting pretrial confinement credit while awaiting extradition is a factor we consider in our decision to overrule *Harnum*. *Compare Matarese v. N.H. Mun. Assoc. Prop.-Liab. Ins. Trust*, 147 N.H. 396, 403 (2002) (taking into consideration that a majority of other jurisdictions have decided an issue in one direction).

█ Furthermore, in this case, no party can reasonably argue they have structured their conduct in reliance upon defendants not receiving pretrial credit while awaiting extradition. Under the second *Jacobs* factor, we inquire into "the cost of a rule's repudiation as it would fall on those who have relied reasonably on the rule's continued application." *Casey*, 505 U.S. at 855. The classic case falling into this category is one creating a rule within the commercial context, "where advance planning of great precision is most obviously a necessity." *Id.* at 856. In this case, therefore, reliance upon a prior rule of law does not weigh against overruling *Harnum*.

█ Although stare decisis generally "has more force in statutory analysis than in constitutional adjudication because, in the former situation, [the legislature] can correct our mistakes through legislation," that is not always the case. *Monell*, 436 U.S. at 695. We are unwilling to mechanically apply the principles of stare decisis to allow a decision that was wrong when it was decided perpetuate as a rule of law. *See id.* Neither will we always place on the shoulders of the legislature the burden to correct our own error. *See id.* As Justice O'Connor wrote in *Casey*, there are some cases of widespread controversy in which a high court is asked to step in and resolve a question of interpretation. *See Casey*, 505 U.S. at 866. Once the court issues a rule of law, it will leave future alterations to the political branches and their active constituents. It is in cases of such political importance that a court must be especially wary of altering course under pressure. The granting of pretrial confinement credit, however, is not such a case. It is neither a socially divisive issue nor one creating a constituency on behalf of which the legislature is likely to act. These circumstances place the burden upon this court to rectify its own error. We therefore overrule *Harnum*. As the *Harnum* dissent noted, if the State wishes to punish defendants who flee the jurisdiction, the legislature can enact separate legal provisions. *Cf.* RSA 642:6, I (2007) ("A person is guilty of an offense if he escapes from official custody.").

In this case, the sole reason the defendant was arrested was the New Hampshire warrant. He should, therefore, receive pretrial confinement credit for time he spent in any jail after his May 3, 2004 arrest in Colombia.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS and GALWAY, JJ., concurred.