Hillsborough-southern judicial district
No. 2007-863

THE STATE OF NEW HAMPSHIRE

v.

SEVERINE WAMALA

Argued: January 22, 2009
Opinion Issued: April 17, 2009

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

Severine Wamala, by brief, *pro se*.

DALIANIS, J. The defendant, Severine Wamala, appeals his conviction of eleven counts of aggravated felonious sexual assault (AFSA). *See* RSA 632-A:2 (2007) (amended 2008). On appeal, he argues that the Superior Court (*Lynn*, C.J.) erroneously: (1) allowed the State to introduce evidence of the victim's "time capsule," a school project in which she had written that she and the defendant had had sex; (2) denied his counsel's request to *voir dire* prospective jurors individually pursuant to RSA 500-A:12-a (Supp. 2008); and (3) permitted the State to impeach the victim's sisters with their prior inconsistent statements. We affirm.

## I. Victim's "Time Capsule" Statements

The defendant first argues that the trial court erred when it admitted evidence of the victim's so-called "time capsule." We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case. *State v. Forbes*, 157 N.H. 570, 572 (2008).

### A. Relevant Facts

The "time capsule" was a sixth grade school project that required the victim to write information about herself on a piece of paper, seal the paper in an envelope, and open the envelope two years later. On the paper, the victim wrote: "[S]omething about me that would surprise most people is . . . I have sex with my father." When the victim was in eighth grade, she opened the envelope and wrote: "I'm not a virgin or have a virgin mouth." She then resealed the envelope.

Although the trial court had initially excluded evidence of the time capsule, after hearing the defendant's theory of the case and his testimony, the court allowed the State to: (1) call the victim as a rebuttal witness to testify about the time capsule as well as about the prior uncharged assaults themselves; and (2) introduce the time capsule into evidence as a full exhibit.

The defendant's theory of the case, as explained by defense counsel in his opening statement, was that he was innocent, "caught in a nightmare of unfounded allegations, a nightmare caused by a willful, rebellious, yet brilliant daughter and police who were overeager to believe her." Defense counsel told the jury that the victim's rebelliousness escalated when the defendant forbade her from obtaining her driver's license although she was old enough to have one. Her rebellion against the defendant allegedly came to a head on September 11, 2006, as a result of a heated argument among the victim, her sister, L.W., her brother, J.W., and the defendant.

As defense counsel told the jury, that night, L.W. was at the stove with a "giant pot full of water that [was] boiling hot." When she walked over to the sink to dump the water from the pot, the victim was in her way. Despite being told repeatedly to get out of the way, the victim refused to move. Eventually, the defendant pushed her out of the way, and "[the victim] went crazy" and began yelling at him. According to defense counsel, "[t]hings escalated," and, soon, everyone was yelling at everyone else. Eventually, J.W. called the police, who came to the apartment, and, after being assured that everyone was safe, left without arresting anyone.

After the police left, the victim and J.W. slowly got ready for bed and could be heard talking to each other in the bathroom and then in their bedroom. J.W. decided to confront the defendant about the incident. J.W. emerged from the bedroom and began to yell at the defendant. The defendant, feeling exasperated, eventually yelled: "[D]o you want to raise my children? Do you want to discipline my children? Then go someplace else." J.W. "called his bluff, so to speak, and . . . left." Upon seeing this, the victim "threw another teenage temper tantrum" and began yelling at the defendant "just like she had done earlier in the night over the pot of water." The defendant asked another daughter to call the police and, when the officers arrived, the victim was "behaving hysterically," telling them that "she just want[ed] to get out of the house and that she[] [was] going to do it any way she [could], including jumping off the third floor balcony." According to defense counsel, at this point, the victim, seeing "an opportunity to get out of the house" and "have more freedom," told the police that her father sexually assaulted her. As defense counsel explained to the jury,

by so doing, this "willful and rebellious teenage girl" engaged the police, who began to "look[] for evidence of a crime that didn't happen, that never occurred."

The defendant testified consistently with this theory of the case. He denied ever having sexual contact with his children. He testified that he could not "do something . . . traumatizing to [his] children" and that he found it "disturbing" to think of committing incest. He testified that it was "just horrifying" to think of having sex with his children and that it made him "throw up." He testified: "[T]here's no way I could ever do that to my children, I mean not even [to] an enemy." He testified that having sex with them was "something I can never do . . . I can never do that to my children, never, ever." When asked why he thought that the victim would say that he had sexually assaulted her, the defendant testified:

> [J.W.] and [the victim] are very tight, and — you now, tight as in closeness, and the fact that [on September 11, 2006,] I had told [J.W.] to leave and I don't think also she believed she [sic] was going to leave, and [the victim] is one of those very willful people, and I think once she started this whole thing of rape, she just wants to be right, and she just wants to continue with it. I mean, that's who she is. She is, you know, very, very willful, and she also wants, you know, I believe also the freedom because she seemed to be excited of [sic] getting her license, you know.

After the defendant testified, the trial court ruled that he had opened the door to evidence about the prior uncharged assaults to which the victim's statements in her time capsule referred. The trial court ruled that this evidence was admissible to rebut the defendant's claim that the victim had fabricated the allegations against him. See N.H. R. Ev. 801(d) (1) (B). The court determined that even though this was evidence of prior bad acts, it was admissible under New Hampshire Rule of Evidence (Rule) 404(b) and that its probative value outweighed its potential prejudice to the defendant, see N.H. R. Ev. 403.

Before allowing the victim to testify about the time capsule, the trial court instructed the jury that her time capsule statements were being admitted only to rebut any suggestion that the defendant may have made that she fabricated her allegations. See N.H. R. Ev. 801(d) (1) (B). The court admonished the jury that, to the extent that these statements referred to any uncharged sexual assaults, the jury could not use them as evidence of the defendant's propensity to commit such assaults, "to say, well, gee, — if he committed some earlier offenses, he must have committed these offenses." See N.H. R. Ev. 404(b).

In its final instructions, the court told the jury:

> In deciding whether to believe a witness, you may consider whether the witness made statements before trial, which are inconsistent with the witness' testimony at trial. Keep in mind that you may only use a prior statement in assessing the witness' credibility. You may not use a statement made before trial as proof that the facts in the prior statement are true. There is one exception to this. You have received in evidence . . . the so-called time capsule. That constitutes a prior statement of [the victim]. . . . You may use that as substantive evidence in the case for its truth on the issue of whether or not . . . the [victim] . . . had some motivation to make a recent fabrication of her testimony at trial. You may consider that prior statement contained in the time capsule . . . for its truth for that purpose.

### B. Discussion

The defendant concedes that he opened the door to the victim's testimony about the uncharged assaults themselves, and that this testimony was admissible. *See State v. Carlson*, 146 N.H. 52, 56-58 (2001); *State v. Taylor*, 139 N.H. 96, 99-101 (1994). He argues that the trial court erred, however, when it admitted the time capsule and the victim's testimony about her statements in it into evidence. He contends that the time capsule and the victim's testimony about her statements are hearsay that do not fall within a hearsay exception and were, thus, inadmissible for the truth of what they asserted. He argues that while he may have opened the door to the victim's testimony about the prior assaults, he did not open the door to this hearsay evidence.

■ The opening the door doctrine comprises two doctrines, the "curative admissibility" and "specific contradiction" doctrines. *State v. Morrill*, 154 N.H. 547, 549-50 (2006). The "curative admissibility" doctrine applies when inadmissible prejudicial evidence has been erroneously admitted, and the opponent seeks to introduce testimony to counter the prejudice. *State v. White*, 155 N.H. 119, 124 (2007). The "specific contradiction" doctrine is more broadly applied when one party has introduced admissible evidence that creates a misleading advantage and the opponent is then allowed to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage. *Id.* The parties agree that this case involves the specific contradiction doctrine.

■ For the specific contradiction doctrine to apply, a party must introduce evidence that provides a justification, beyond mere relevance, for

the opponent's introduction of evidence that may not otherwise be admissible. *Id.* The initial evidence must, however, have reasonably misled the fact finder in some way. *Id.* The rule thus prevents a party from successfully excluding evidence favorable to his opponent, and then selectively introducing this evidence for his own advantage, without allowing the opponent to place the evidence in proper context. *Id.*

██ "The fact that the door has been opened does not, by itself, permit all evidence to pass through." *State v. Benoit*, 126 N.H. 6, 21 (1985). The doctrine is intended to prevent prejudice, and is not to be subverted into a rule for the injection of prejudice. *Morrill*, 154 N.H. at 550. The trial court is in the best position to gauge the prejudicial impact of particular testimony. *Carlson*, 146 N.H. at 56. Therefore, we will not upset the trial court's ruling on whether the defendant opened the door to prejudicial rebuttal evidence absent an unsustainable exercise of discretion. *See id.*; *White*, 155 N.H. at 123.

The defendant concedes that when he testified that he could "never" sexually assault his children, it opened the door to evidence that he had sexually assaulted the victim in the past. *See Carlson*, 146 N.H. at 56-58; *Taylor*, 139 N.H. at 99-101. As he admits, the jury logically could have interpreted his testimony as an assertion that it was not within his character to sexually assault his own children. *See Carlson*, 146 N.H. at 57. The court could reasonably have concluded that introducing evidence of the prior uncharged assaults was, therefore, necessary to counter this misleading advantage. *See id.*

The defendant contends, however, that he did not open the door to evidence of the victim's statements in her time capsule. These statements, he asserts, are hearsay and, thus, were inadmissible.

██ To the extent that the defendant argues that he never actually opened the door to evidence of the victim's statements, we disagree. While the defendant's testimony about his good character may not have opened the door to evidence of the victim's statements in her time capsule, the trial court reasonably could have found that his claim that her testimony at trial was the result of fabrication *did* open the door. The trial court reasonably could have determined that the victim's testimony about the prior uncharged assaults, alone, was insufficient to counter this claim, and that her testimony about the time capsule statements and the time capsule itself were necessary.

In this way, this case is distinguishable from *Morrill*, 154 N.H. at 551-52. In *Morrill*, the trial court had allowed the State to introduce statements by the victim's father to the police regarding why he had delayed reporting the defendant's sexual abuse of the victim. *Morrill*, 154 N.H. at 549. Because

the victim's father died before trial, the statements were introduced through a police officer. *Id.* On appeal, the State conceded that the statements constituted inadmissible hearsay. *Id.*

The trial court had admitted the statements, in part, because it found that the defendant had opened the door to them. *Id.* We concluded that this was error because whatever misleading impression the defendant may have given the jury about the father's delay in reporting his daughter's abuse had already been countered by admissible evidence that directly countered this theory. *Id.* at 551-52. "Because the State had presented admissible evidence supporting its alternative explanation for [the father's] delay, introducing . . . inadmissible hearsay for the same purpose was unnecessary." *Id.* at 552.

■ By contrast, here, the admissible evidence — the victim's testimony about the prior assaults themselves — did not directly counter the defendant's theory that she fabricated her allegations against him because her testimony about the prior assaults could have been the result of the same rebelliousness as the defendant alleged her testimony about the charged assaults was. Accordingly, the trial court reasonably could have determined that introducing otherwise inadmissible hearsay evidence of statements made before the rebellion incidents was necessary.

Moreover, the trial court's limiting instruction to the jury mitigated the potential for unfair prejudice to the defendant from admission of the victim's time capsule statements. *See State v. Dean*, 129 N.H. 744, 750 (1987) (defendant's claim of prejudice from potential substantive use of prior consistent statement unfounded, especially in light of trial court's limiting instruction). The court twice instructed the jury that it could consider the victim's time capsule statements to the extent that they were relevant to rebut the defendant's charge that the victim had fabricated her allegations. The jury was told that it could not consider the statements as evidence of the defendant's propensity to assault his children.

Further, to the extent that the defendant argues that the opening the door doctrine does not allow the admission of hearsay evidence, he is mistaken. Under either the curative admissibility doctrine or the specific contradiction doctrine, the court has the discretion to admit otherwise inadmissible evidence. *Morrill*, 154 N.H. at 549-50.

■ The defendant observes that the trial court did not, in fact, admit the victim's testimony about her statements and the time capsule itself under the opening the door doctrine. He contends that they were admitted under Rule 801(d) (1) (B), which he argues, was error. We will assume, without deciding, that the defendant is correct. We affirm the trial court, nonetheless, because "where the trial court reaches the correct result on mistaken

grounds, we will affirm if valid alternative grounds support the decision." *State v. Beede*, 156 N.H. 102, 106 (2007) (quotation and brackets omitted).

*II. Jury Voir Dire*

■ The defendant next argues that the trial court erred when it refused to allow his attorney to *voir dire* potential jurors during jury selection pursuant to RSA 500-A:12-a. RSA 500-A:12-a provides for attorney-conducted, individual *voir dire* of potential jurors in civil cases. *See* RSA 500-A:12-a, III, IV. The defendant contends that RSA 500-A:12-a must also apply to criminal cases either pursuant to RSA 606:1 (2001), or because to allow attorney-conducted, individual *voir dire* in civil but not in criminal cases violates the Equal Protection Clauses of the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 1, 2; U.S. CONST. amend. XIV. Because we decide cases on constitutional grounds only when necessary, *see White v. Town of Wolfeboro*, 131 N.H. 1, 3 (1988), we first examine the defendant's statutory claim.

Resolving this claim requires that we engage in statutory interpretation. The interpretation of a statute is a question of law, which we review *de novo*. *State v. Brown*, 155 N.H. 590, 591 (2007). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Gallagher*, 157 N.H. 421, 422-23 (2008). We first examine the language of the statute, and, where possible, we apply the plain and ordinary meanings to the words used. *Id.* at 423. We will neither consider what the legislature might have said nor add words that it did not see fit to include. *State v. Duran*, 158 N.H. 146, 155 (2008).

The practice in New Hampshire has been that jury *voir dire* is conducted solely by the trial judge, except in capital and first-degree murder cases. *State v. Fernandez*, 152 N.H. 233, 239 (2005). In 2004, the legislature enacted RSA 500-A:12-a, which allows for attorney-conducted individual *voir dire* in civil cases as well. Pursuant to RSA 500-A:12-a, III, counsel for each party in a civil case may "examine, by oral and direct questioning, any of the prospective jurors in order to enable counsel to intelligently exercise both peremptory challenges and challenges for cause." Under RSA 500-A:12-a, IV, the scope of such examination "shall be within reasonable limits prescribed by the trial judge's sound discretion."

While on its face, RSA 500-A:12-a applies only to "jury selection for civil cases," the defendant contends that it must apply also to criminal cases pursuant to RSA 606:1. RSA 606:1 provides: "Petit jurors attending the court may be impanelled for the trial of any criminal case and may be examined as in civil cases and otherwise, as to their fitness and capacity to perform the duty of jurors on the trial." The defendant contends that the

phrase "may be examined as in civil cases" mandates parity between civil and criminal jury selection procedures, and requires that RSA 500-A:12-a apply to criminal trials.

The plain meaning of RSA 606:1, to the contrary, is that jurors empanelled for a criminal trial "may" be examined as in civil cases. It is a general rule of statutory construction that the word "may" is permissive. *State v. Korean Methodist Church of N.H.*, 157 N.H. 254, 256-57 (2008). By its express terms, therefore, RSA 606:1 does not require that jurors in criminal trials be subject to the same *voir dire* process as jurors in civil trials. Accordingly, we hold that RSA 606:1 does not mandate that the attorney *voir dire* process outlined in RSA 500-A:12-a, III and IV apply to criminal trials.

Alternatively, the defendant argues that applying RSA 500-A:12-a, III and IV to civil but not to criminal trials violates the equal protection of laws guaranteed by the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 1, 2; U.S. CONST. amend. XIV. Whether a statute is constitutional is a question of law, which we review *de novo*. *Akins v. Sec'y of State*, 154 N.H. 67, 70 (2006). "In reviewing a statute, we presume it to be constitutional and we will not declare it invalid except upon inescapable grounds." *Id.* (quotation omitted).

We first address the defendant's claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only, *id.* at 232-33. In considering an equal protection challenge under our State Constitution, we must first determine the appropriate standard of review by examining the purpose and scope of the State-created classification and the individual rights affected. *State v. Chrisicos*, 158 N.H. 82, 87 (2008).

The parties disagree as to the level of scrutiny we should apply. The State contends that we need apply only rational basis review because the classification at issue does not involve infringement of a fundamental right, an important substantive right or application of some recognized suspect classification. *See id.*

The defendant counters that because the jury selection process is an important substantive right, we must apply intermediate scrutiny. *See In re Sandra H.*, 150 N.H. 634, 638 (2004). To support this assertion, he relies upon Part I, Article 21 of the State Constitution, which provides: "In order to reap the fullest advantage of the inestimable privilege of the trial by jury, great care ought to be taken, that none but qualified persons should be appointed to serve; and such ought to be fully compensated for their travel, time, and attendance." The defendant argues that by describing the right to

a jury trial as "inestimable" and stating that "great care ought to be taken" in ensuring that "none but qualified persons [are] appointed to serve" as jurors, Part I, Article 21 elevates the mechanics of jury selection to an important substantive right.

We disagree with the defendant that the jury selection process itself is an important substantive right. "[W]hile the right to an impartial jury enjoys constitutional protection, the manner in which *voir dire* is conducted is wholly within the sound discretion of the trial judge." *State v. McLellan*, 146 N.H. 108, 111 (2001) (quotation omitted). "The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Viewed as such, *voir dire* is but a means to achieve the end of an impartial jury. *People v. Boulerice*, 7 Cal. Rptr. 2d 279, 285 (Ct. App.), *review denied* (Cal. 1992); *see State v. Goding*, 124 N.H. 781, 783 (1984). "Federal and state courts have held . . . that the Legislature may establish reasonable regulations or conditions on the right to a jury trial as long as the essential elements of a jury trial are preserved, including number of jurors (12), unanimity, and impartiality." *People v. Robinson*, 124 P.3d 363, 377 (Cal. 2005), *cert. denied*, 549 U.S. 953 (2006); *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144 n.17 (1994) (noting, a state is free to adopt whatever jury selection procedures it desires, provided that these procedures do not violate the State or Federal Constitutions). "Therefore, there is no constitutional right to any particular manner of conducting the *voir dire* and selecting a jury so long as such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries are not transgressed." *People v. Ramos*, 101 P.3d 478, 492 (Cal. 2004) (quotation omitted), *cert. denied*, 546 U.S. 844 (2005).

■ Because we conclude that the classification at issue between civil and criminal *voir dire* does not involve important substantive rights, we hold that the rational basis test applies. *See Chrisicos*, 158 N.H. at 87 ("Absent some infringement of a fundamental right, an important substantive right, or application of some recognized suspect classification, the constitutional standard to be applied is that of rationality." (quotation and brackets omitted)).

■ Under the rational basis test, we determine whether the challenged legislation is rationally related to a legitimate state interest. *Id.* The party challenging the alleged statutory classification "has the burden to prove that the classification is arbitrary or without some reasonable justification" and "to negative every conceivable basis which might support the classification, whether or not the basis has a foundation in the record." *Id.* (quotations and brackets omitted).

We find the California Supreme Court's decision in *Robinson* instructive. *Robinson* involved California Code of Civil Procedure section 222.5, which like RSA 500-A:12-a, conferred a right of attorney *voir dire* in civil cases, but not in criminal cases. *Robinson*, 124 P.3d at 377. Under California Code of Civil Procedure section 223, the court conducted *voir dire* in a criminal case, although the parties upon a showing of good cause could supplement the court's examination. *Id.* The defendant argued that California Code of Civil Procedure section 223 violated his right to equal protection, and the court disagreed.

The court first determined that the proper level of scrutiny was rational basis for the same reasons that we have articulated. *See id.* The court then determined that the distinction between criminal and civil *voir dire* was constitutional because it was rationally related to a legitimate state purpose. *Id.* The court observed that California Code of Civil Procedure section 223, which required the court to conduct *voir dire* in a criminal trial, was enacted to prevent criminal counsel from abusing the jury selection process, and that this is a legitimate purpose to which this provision was rationally related. *Id.* Therefore, the court concluded, this provision did not deny the defendant his rights to equal protection. *Id.*

██ ██ Regardless of whether preventing abuse of the jury selection process in criminal cases was the legislature's actual purpose in enacting RSA 500-A:12-a and distinguishing between civil and criminal *voir dire*, it is a conceivable justification for so doing, and, thus, constitutes a rational basis. *See Chrisicos*, 158 N.H. at 88-89. Other conceivable justifications for distinguishing between civil and criminal *voir dire* include cost and speedy trial concerns. The legislature rationally could have believed that requiring individual attorney-conducted *voir dire* in all criminal cases would be costly and would result in delayed criminal trials. The legislature could also rationally have decided to change the requirements for *voir dire* incrementally, starting with civil trials, before expanding the change to criminal trials. "The ability to take one step at a time, to alter the rules for one subset (to see what happens) without changing the rules for everyone, is one of the most important legislative powers protected by the rational-basis standard." *Johnson v. Daley*, 339 F.3d 582, 596 (7th Cir. 2003), *cert. denied*, 541 U.S. 935 (2004); *see Estate of Cargill v. City of Rochester*, 119 N.H. 661, 668 (1979) ("In enacting a particular statute, . . . the legislature may address itself to only that phase of a problem that appears most acute, even if the net result resembles a crazy quilt more than a carefully balanced sculpture." (quotation and citation omitted)), *appeal dismissed*, 445 U.S. 921 (1980).

Having articulated these legitimate state interests to which the distinction between civil and criminal jury *voir dire* as codified in RSA 500-A:12-a is rationally related, we conclude that applying RSA 500-A:12-a to civil trials only does not violate the defendant's right to equal protection under the State Constitution. As the Federal Constitution affords no greater protection than does the State Constitution in this context, *see In re Sandra H.*, 150 N.H. at 637-39, we necessarily reach the same result under both constitutions.

### III. Impeachment of Victim's Sisters

In his *pro se* brief, the defendant argues that the trial court erred by allowing the State to impeach L.W. and the victim's other sister, T.W., with their prior inconsistent statements. *See State v. Soldi*, 145 N.H. 571 (2000). We review this claim under our unsustainable exercise of discretion standard. *State v. Beltran*, 153 N.H. 643, 651 (2006).

Both T.W. and L.W. told the police that the defendant had had sex with them. The defendant, therefore, was charged with one count of AFSA and six counts of incest for acts involving L.W., and five counts of incest for acts involving T.W.

Both L.W. and T.W. later recanted in interviews with an investigator for the Public Defender. The State called both L.W. and T.W. as witnesses. Both testified that the defendant had never had sex with them, and the State impeached them with their prior statements. At the close of the State's case, the court dismissed all of the counts involving T.W. and all but one of the counts involving L.W. The jury acquitted the defendant of the remaining count involving L.W.

Rule 607 provides that the "credibility of a witness may be attacked by any party, including the party calling the witness." N.H. R. Ev. 607. Under Rule 613(b), such impeachment may be accomplished by use of a prior inconsistent statement. We have construed Rule 607 as enabling a trial court, in the exercise of its sound discretion, to allow a witness's prior statements to be used for impeachment purposes even when the party calling the witness already knows the substance of the anticipated trial testimony and is, therefore, not surprised by it. *Beltran*, 153 N.H. at 651. A witness's prior inconsistent statement may be admitted to attack her credibility even if the statement tends to inculpate the defendant directly. *Soldi*, 145 N.H. at 574.

In *Soldi*, however, we held that the State may not use a statement under the guise of impeachment for the primary purpose of placing before the jury otherwise inadmissible substantive evidence. *Id.* This limitation

prevents the State from using impeachment by prior inconsistent statement as a mere subterfuge to avoid the hearsay rule. *Id.* On the other hand, where the State has called a witness whose corroborating testimony is instrumental to constructing the State's case, the State has the right to question the witness, and to attempt to impeach her, about those aspects of her testimony that conflict with the State's account of the same events. *Id.* In analyzing whether impeachment of a party's own witness would constitute subterfuge, courts look at whether the witness's testimony contains relevant evidence other than the impeaching evidence. *Id.*

 Contrary to the defendant's assertions, we conclude that the testimony of L.W. and T.W. contained evidence that was relevant and instrumental to constructing the State's case against him. For instance, both L.W. and T.W. testified as to the sleeping arrangements in the house and the September 11, 2006 argument. Consequently, we hold that the trial court sustainably exercised its discretion when it allowed the State to impeach L.W. and T.W. with their prior inconsistent statements. *See Beltran*, 153 N.H. at 652.

Because we affirm his conviction, we need not address the defendant's argument in his *pro se* brief regarding retrial and double jeopardy. Although the defendant raises additional arguments in his *pro se* brief, we conclude that they lack merit and warrant no extended consideration. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.