Hillsborough-northern judicial district
No. 2008-945

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL ADDISON

Argued: June 16, 2009
Opinion Issued: July 9, 2009

*Kelly A. Ayotte*, attorney general (*N. William Delker*, senior assistant attorney general, and *Jeffery A. Strelzin*, senior assistant attorney general, on the memorandum of law, and *Mr. Delker* orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, *Richard Guerriero*, director of litigation services, and *Christopher M. Johnson*, chief appellate defender, of Concord, on the memorandum of law, and *Mr. Rothstein* orally, for the defendant.

*New Hampshire Association of Criminal Defense Lawyers (Michael J. Iacopino on the memorandum of law), as amicus curiae.*

DUGGAN, J. The defendant, Michael Addison, was convicted of capital murder, *see* RSA 630:1, I(a) (2007), and sentenced to death. His conviction and sentence are now on appeal. *See* RSA 630:5 (2007). The issue currently before us is whether special appellate rules must be adopted prior to any review of the merits of the appeal.

The record reveals the following procedural posture. On December 18, 2008, a jury recommended that the defendant be sentenced to death. On December 22, 2008, the Superior Court (*McGuire,* J.) imposed the sentence. On December 31, 2008, we opened the present appeal pursuant to RSA 630:5, X. In doing so, we requested that the parties submit a joint response as to the recommended procedure and schedule to be followed for this case. We requested the parties address five questions. The questions, together with the parties' answers, follow:

> *Question 1*: The nature of the court's automatic review of the judgment of convictions provided for in RSA 630:5, including whether it differs from appellate review of a conviction in a criminal case under Supreme Court Rule 7, and, if so, how it differs . . . .
>
>> *Answer 1*: While the nature of the automatic review may differ in a case where the defendant does not intend to file a notice of appeal outlining the issues to be heard on appeal, the defendant in the case at bar intends to file a notice of appeal pursuant to Rule 7. The defendant has timely filed several post-trial motions in superior court, which have tolled the time limit for the filing of the notice of appeal. *See* N.H. S. CT. R. 7(1)(C). Following resolution of those motions, which are scheduled to be heard on March 6, 2009, the defendant intends to file a notice of appeal challenging both the judgment of conviction and the sentence of death. The mechanics of appellate review in this case may differ from a typical Rule 7 case if the Court adopts special rules to govern the factors in RSA 630:5, XI. . . . The defense will request that the Court adopt rules, and the State will argue that additional rules are not necessary.
>
> *Question 2*: The effect of the provision in RSA 630:5, X, that requires this court's automatic review to occur within 60 days

after certification of the record by the sentencing court, which may be extended for an additional period of 30 days for good cause . . . .

> *Answer 2*: The parties agree that RSA 630:5, X, does not require the case be briefed and decided within the 60-day time limit. Indeed, given the record in this case and the issues to be decided, any such time limitation is unworkable. Rather, paragraph X only requires that the case be "subject to automatic review" within the 60-day time frame. The parties interpret this time frame to apply in those cases in which a defendant does not intend to file a notice of appeal outlining the issues to be heard on appeal. In other words, in that situation, this Court would have to accept the appeal and identify the issues to be heard on appeal within 60 days of receiving the complete record. In the present case, the defense will file an appeal of both the capital murder conviction and sentence of death under Rule 7. The appeal will raise all issues described in RSA 630:5, XI. To the extent that the appeal addresses the factors outlined in RSA 630:5, XI, the defense argues that Rule 7 does not provide the procedures necessary for appellate review. The defense maintains its position, as noted in earlier pleadings before this Court, that additional, specific rules of appellate procedure are required by RSA 630:5, X, and both the state and federal constitutions. It will advance this position in a separate memorandum. . . . The State intends to argue that no such additional, specific rules of appellate procedure are necessary to decide a capital murder appeal.

*Question 3*: The process that the court should follow in reviewing the sentence of death, and in making the specific determinations required by RSA 630:5, XI . . . .

> *Answer 3*: The parties have conferred and cannot agree on the answer to this question. The parties intend to file separate memoranda outlining their respective positions on this issue.

*Question 4*: The effect, if any, that the filing of appeals by the defendant of convictions that were considered aggravating factors under RSA 630:5, VII, should have on review in this case . . . .

*Answer 4*: The parties agree that the appeals of the non-capital convictions, which were considered as aggravating factors, should be heard and decided before the appeal of the conviction or sentence in the capital murder case is briefed. In other words, briefing of the capital murder conviction and death sentence should not begin until after this Court decides the appeals in the following cases: *State v. Michael Addison*, No. 2009-0047 (Edward J. Roy Drive); *State v. Michael Addison*, No. 2009-0046 (7-Eleven robbery); *State v. Michael Addison*, No. 2009-0048 (El Mexicano robbery). This will allow the parties to address the impact of the resolution of those appeals on the capital murder conviction and death sentence.

The defendant intends to argue that this Court should additionally review a legal issue regarding certain Massachusetts convictions upon which the State relied as aggravators. The State does not agree that this issue should be considered at the same time as those set forth in [the previous paragraph]. The defendant will set forth his position in a separate memorandum, to which the State may respond after the defendant has filed his memorandum on this issue.

*Question 5*: The procedure that the court should follow in reviewing the judgment of conviction and the penalty of death; specifically, whether review of the judgment of conviction and review of the penalty of death should be bifurcated.

*Answer 5*: The parties agree that this Court should defer ruling on the briefing schedule for the capital murder conviction and death sentence until after the defendant has filed his Rule 7 notice of appeal. This will allow the Court and the parties to evaluate whether issues can be grouped for briefing and argument. The parties are willing to confer and propose a briefing schedule following the filing of the notice of appeal.

As indicated above, the parties could not agree upon a joint response as to the third question regarding the process we should follow in reviewing the sentence of death and making the specific determinations required by RSA 630:5, XI. It is this issue that we address here.

The State argues that the appellate process in this case is no different than in any other, and that our ordinary rules of appellate procedure and

case law define the requisite standards for our review pursuant to RSA 630:5, XI. The defendant contends that the plain language of RSA 630:5, XI, as well as the State and Federal Constitutions, require that our review be conducted under special rules. The defendant therefore moves for a stay of appellate review pending the adoption of rules pursuant to Supreme Court Rule 51.

In addressing the parties' arguments, we first look to the capital murder appeals statute. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *State v. Formella*, 158 N.H. 114, 116 (2008). When interpreting statutes, we look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *State v. Duran*, 158 N.H. 146, 155 (2008). We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *See* RSA 625:3 (2007); *Petition of State of N.H.*, 152 N.H. 185, 187 (2005). We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Duran*, 158 N.H. at 155. Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent. *Formella*, 158 N.H. at 116.

RSA 630:5 provides, in pertinent part:

> X. In all cases of capital murder where the death penalty is imposed, the judgment of conviction and the sentence of death shall be subject to automatic review by the supreme court within 60 days after certification by the sentencing court of the entire record unless time is extended for an additional period not to exceed 30 days by the supreme court for good cause shown. Such review by the supreme court shall have priority over all other cases and *shall be heard in accordance with rules adopted by said court.*
>
> XI. With regard to the sentence the supreme court shall determine:
>
>> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
>>
>> (b) Whether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law; and
>>
>> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(Emphasis added.)

■ The portion of the statute requiring that cases "shall be heard in accordance with rules adopted by said court" does not require special rules. Instead, based upon its plain language, the statute requires simply that we have appellate rules and that such rules are followed. Had the legislature intended us to adopt separate, special rules of appellate review for capital cases, it would have included such language. *See, e.g.*, RSA 169-C:10, III (2002) ("The New Hampshire supreme court shall adopt rules regarding the duties and responsibilities of the . . . guardian ad litem."); RSA 461-A:7, XI (Supp. 2008) ("The supreme court shall establish rules . . . to effectuate the purpose of this section."); RSA 490:26-a (Supp. 2008) ("establish by rule an equitable fee schedule"); RSA 490:32, V (Supp. 2008) ("establish disciplinary rules"); RSA 600-A:2, II (2001) ("adopt general rules . . . establishing standard procedures for the convening of multicounty grand juries"); RSA 606:10, VII (2001) ("adopt rules implementing the provisions of this section"). Rather, the language provides, generally, that our review must be pursuant to "rules adopted." The legislature did not require special rules, and we will not add words to the statute that the legislature did not see fit to include. *Duran*, 158 N.H. at 155. Thus, our review of death sentences may be completed consistent with our preexisting appellate rules. *See, e.g.*, SUP. CT. R. 5-7, 13-18, 21; *see also Games v. State*, 535 N.E.2d 530, 537 (Ind.) ("We have repeatedly held that our standard rules of appellate review allow for the requisite meaningful appellate review of death penalty cases."), *cert. denied*, 493 U.S. 874 (1989).

We next address the defendant's argument under the State and Federal Constitutions. The defendant argues that special rules of appellate review are required pursuant to "his rights to due process and effective assistance of counsel, and against the imposition of punishment that is cruel, unusual or disproportionate." We initially address the defendant's claim under the New Hampshire Constitution, citing federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 231 (1983).

■ Part II, Article 73-a of the State Constitution provides:

> The chief justice of the supreme court shall be the administrative head of all the courts. He shall, with the concurrence of a majority of the supreme court justices, make rules governing the administration of all courts in the state and the practice and procedure to be followed in all such courts. The rules so promulgated shall have the force and effect of law.

Although Part I, Articles 15, 18, and 33 of the State Constitution entitle the defendant to a fair appellate procedure, free from arbitrary and discrimi-

natory enforcement, we conclude that the constitution does not require that the procedure be adopted through the formal rulemaking process.

▮ Our view is consistent with that of the United States Supreme Court, which has never mandated formal rulemaking for review of death penalty cases. *See Proffitt v. Florida*, 428 U.S. 242, 258 (1976) ("While it may be true that [Florida] has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary."). Although some jurisdictions have adopted specific rules of appellate review, *see, e.g.*, CONN. R. APP. PROC. 67-6, others have not, *see, e.g.*, *Games*, 535 N.E.2d at 537.

▮ We conclude that RSA 630:5 and the Supreme Court Rules govern our appellate procedure in capital sentence review. *See Gregg v. Georgia*, 428 U.S. 153, 195 (1976). Neither the State nor Federal Constitution mandate formal rulemaking. Thus, the defendant's motion to stay pending the formal rulemaking process is denied.

We now address the procedure we will follow prior to our review on the merits. The State argues that our review pursuant to RSA 630:5, XI requires an analysis similar to any other issue of first impression. The defendant argues that the formal rulemaking process is necessary. We disagree. We conclude, however, that in the interest of fairness to the parties, we should determine the standards we will apply to the factors enumerated in RSA 630:5, XI prior to any review of the merits.

The factors articulated in RSA 630:5, XI were adopted in 1977 following the United States Supreme Court decision in *Gregg*. Prior to *Gregg*, in *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court held that the Georgia death penalty statute violated the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238, 309 (1972). The Court found the Georgia statute unconstitutional because the death penalty was "wantonly and . . . freakishly imposed." *Id.* at 310. Following *Furman*, the Georgia death penalty statute was amended. *Gregg*, 428 U.S. at 162-63. The amended sentencing procedures required that the Georgia Supreme Court "review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* at 204 (quotation and brackets omitted). The United States Supreme Court upheld the amended statutory scheme, stating "the concerns expressed in *Furman* that the penalty of death not be imposed in

an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Id.* at 195.

In response to *Gregg*, several states, including New Hampshire, enacted death penalty statutes based upon the Georgia statute, including a provision for comparative proportionality review. *See, e.g.*, Laws 1977, 440:2 ("Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."). The proportionality review was considered to be constitutionally required until the United States Supreme Court explicitly rejected the idea in *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."). After *Pulley*, several states amended their death penalty statutes, repealing the provision requiring comparative proportionality review. *See, e.g.*, 1995 Conn. Acts 16, § 3(b); *State v. Bland*, 958 S.W.2d 651, 663-64 n.11 (Tenn. 1997) (listing states that initially required proportionality review and subsequently repealed it), *cert. denied*, 523 U.S. 1083 (1998). Those states that continue to require a comparative proportionality review have developed standards. *See Bland*, 958 S.W.2d at 664 ("Without explicitly adopting the nomenclature, this Court has applied the precedent-seeking approach for the past eighteen years.").

The substance of our death penalty statute, however, has remained unchanged since 1977. Moreover, unlike other jurisdictions, our case law interpreting our death penalty statute is undeveloped. As other courts have pointed out, "New Hampshire has not defined the pool for comparison because it has no death penalty cases, though it has a capital sentencing scheme." *Id.* at 666 n.12. The standards to be applied to the factors articulated in RSA 630:5, XI presents an issue of first impression. Thus, in the interest of fairness, because the parties do not have the benefit of our prior interpretation of RSA 630:5, we will determine the standards to be applied to each of the three factors in RSA 630:5, XI prior to our review of the merits. We will issue a briefing schedule to allow the parties an opportunity to address these issues.

*So ordered.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.